# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **for the use and benefit of** | ) | |
| **WINDOW SPECIALISTS, INC.** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **1:11-cv-01610-RMC** |
| | ) | |
| **FORNEY ENTERPRISES, INC.,** *et al.* | ) | |
| | ) | |
| **Defendant** | ) | |

## DEFENDANT/COUNTER-PLAINTIFFS' POST-TRIAL BRIEF

Defendant/Counter-Plaintiffs Forney Enterprises, Inc. ("FEI") and Hanover Insurance Company ("Hanover" and collectively, the "Defendants") respectfully submit this Post-Trial Brief.

## I.    INTRODUCTION

Window Specialists, Inc. ("WSI") brought the present action against FEI and Hanover seeking payment of the majority of its subcontract balance despite the fact that it was terminated for default after failing in its attempt to complete only a fraction of its work.  Furthermore, the evidence presented at trial demonstrates that all of the materials supplied by WSI and all of the work performed by WSI had no value and all had to be removed, replaced and re-procured.

FEI was a subcontractor to IIU Consulting Institute, Inc. ("IIU"), who was the prime contractor to the U.S. Government (the "Government") to replace doors and windows on certain buildings at Fort McNair in Washington, DC (the "Project").  FEI entered into a subcontract (the "Subcontract") with WSI for WSI to perform work to complete FEI's scope of work under its contract with IIU.   Critically, the terms and conditions of the Subcontract govern the issues in dispute in this litigation.  WSI has failed to prove that FEI committed a material breach of any of the terms of the Subcontract.

From the beginning, there were significant problems with WSI's work.  As a result, the Government issued IIU a 10-day Cure Notice.  In turn, IIU provided FEI a cure period and FEI provided WSI a cure period.  Despite being given a cure period, WSI could not and did not correct the significant deficiencies in its work.  As a result, IIU terminated FEI for default.  In turn, FEI properly terminated WSI for default.

At the time of termination, WSI had installed only 100 of 684 windows and 12 of 66 doors within its scope, all of which were improperly installed and had to be removed and replaced.  Despite the limited scope performed by WSI, and the significant deficiencies in WSI's work, in its original Complaint, WSI sought $936,967, which is almost 90% of its total Subcontract value.

Following termination, several of WSI's largest suppliers were paid directly by IIU for materials supplied for the Project.  Inexplicably, although WSI performed only a fraction of its scope of work, all of which was deficient, and although IIU paid several of WSI's suppliers directly for materials supplied on the Project, WSI still seeks recovery of approximately $650,000, which is in excess of 65% of its total Subcontract value.  This is despite the fact that all of the labor and materials supplied by WSI had to be removed, replaced and re-procured.

WSI bears the burden of proving by a preponderance of the evidence that:  (1) FEI breached the Subcontract for non-payment; (2) FEI's termination for default of WSI was improper; and (3) it suffered damages as a result of FEI's actions (and can substantiate such damages).  WSI had failed to meet its burden of proof as to any of these items.

## II.   LEGAL STANDARD

A plaintiff bears the burden of "establishing each element of their claims by a preponderance of the evidence."  *Ascom Hasler Mailing Systems, Inc. v. U.S. Postal Service*, 885 F. Supp. 2d 156, 181 (D.D.C. 2012).  The preponderance of the evidence standard requires the fact-finder to believe that the existence of a fact is more probable than the non-existence of that fact.  *Ascom Hasler Mailing*

2

*Systems*, 885 F. Supp. 2d at 181; *U.S. v. Smith*, 267 F.3d 1154, 1161 (D.C. Cir. 2001); *see also Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).

## III.   ARGUMENT

### A.   WSI has Failed to Establish by a Preponderance of the Evidence that FEI Committed a Material Breach of the Subcontract for Non-Payment

WSI's claims against FEI and Hanover in this litigation are premised on WSI's allegation that FEI failed to pay WSI monies due under the Subcontract.  WSI's premise is incorrect based on the terms of the Subcontract and the facts presented at trial.

In a breach of contract action, the party alleging a breach of contract bears the burden of proof in establishing the breach of contract.  *Grunseth v. Marriott Corp.,* 872 F. Supp. 1069, 1073 (D.D.C. 1995); *Technical Assistance Int'l, Inc. v. U.S.*, 150 F.3d 1369, 1373 (Fed. Cir. 1998).  Review of the relevant contract provisions and facts demonstrates that WSI has not met its burden of proof in establishing that FEI breached the Subcontract by non-payment to WSI.

The Subcontract incorporated by reference the IIU-FEI Contract.  FEI Exhibit 11, Article 1.1.1.1.  Under the Subcontract, WSI was required to "assume all obligations, risks and responsibilities to FEI which FEI has assumed toward [IIU]" and FEI was to have "all rights and remedies with respect to [WSI] as [IIU] has with respect to FEI."  *Id.* at Article 1.1.2.4.

Section 2 of the IIU-FEI Contract regarding payments provides the payment terms and procedures between IIU and FEI.  This Section provides, in relevant part:

> Payment shall be made in monthly progress payments in accordance with the percent complete of this [IIU-FEI Contract] of labor and material which have been incorporated into the work of improvement; progress payments to [FEI] shall be made only with sums received by [IIU] from Owner for work performed by [FEI].

FEI Exhibit 9.

The Subcontract outlines the payment terms and procedures between FEI and WSI.  Article 5.2.1 of the Subcontract provides that WSI "must submit to FEI an itemized application for payment . . . supported by such data substantiating [WSI's] right to payment as FEI [or IIU] may require, including

requisitions from subcontractors and sub-suppliers."  FEI Exhibit 11.  Critically, Article 5.2.4 of the

Subcontract provides that "[n]o partial payment shall be due [WSI] unless and until FEI receives

payment from [IIU] and provided that the Work has been approved by FEI and [IIU] and provided that

[WSI] is in compliance with the terms of its Subcontract."  *Id.*  (Emphasis added).[1]

Pursuant to Article 5.3 of the Subcontract, FEI was "not obligated to make any payment" to

WSI under the Subcontract if, *inter alia*, WSI "failed to perform its obligations under the Subcontract

or otherwise is in default under the Subcontract or the Contract Documents" or if "any part of such

payment is attributable to Work which is not performed in accordance with the Contract Documents."

As to payments for stored materials, Article 5.2.3 of the Subcontract provides[2]:

> If the Contract Documents allow partial payment for materials stored either off-site or
> on-site, such payments shall be made to [WSI] in the amounts and under the standards
> set forth in the Contract Documents for off-site or on-site stored materials once such
> payments have been approved by FEI and [IIU], but only after FEI's receipt of payment
> from [IIU].

FEI Exhibit 11.

WSI's performance on the Project was deficient.  Prior to WSI's termination, the Government

did not pay IIU and IIU did not pay FEI any monies for WSI's work and/or materials.  Following the

FEI/WSI termination, IIU had no further obligation to make payments to FEI and thus, FEI had no

further obligation to make payments to WSI.  Simply put, FEI did not breach the Subcontract by

failing to pay WSI monies WSI incorrectly asserted it was due.

1. WSI was paid all monies it was due for work performed on the Project

In its Payment Application No. 1, WSI invoiced $26,000 for measurement of the windows.

WSI Exhibit 45 at pgs. IIU000897-98.  In its Payment Application No. 2, WSI invoiced $13,000 for

---

[1] FEI's Keith Forney testified that the Subcontract is a standard FEI form and that references in the Subcontract to "the Owner" were references to IIU and not the true owner on this Project – the Government.

[2] Note that FAR 52.232-5 regarding payment for stored materials requires a contractor to provide substantiation of its costs for stored materials and to provide evidence that it has acquired title to the stored materials for which it is seeking payment.

shop drawings.  *Id.* at IIU000922-23.  The work and the billings reflected in WSI's Payment

Application Nos. 1-2 occurred <u>before the Subcontract between FEI and WSI was executed.</u>  FEI

Exhibit 11.  IIU's Frank Ukoh testified that IIU paid WSI $26,000 for Payment Application No. 1 out

of its own pocket prior to being paid by the Government for this work.

 As of the time IIU terminated FEI and FEI terminated WSI, Mr. Ukoh testified that the

Government had only paid IIU $40,000, which represented payment for the window measurements

($26,000) and partial payment for IIU's costs in securing the bond for the Project ($26,000).  Mr. Ukoh

testified that he had not been paid by the Government for the shop drawings.  Thus, under the payment

terms of the IIU-FEI Contract and the Subcontract, WSI was not entitled to any additional payments

beyond the $26,000 it received because additional payments had not been made from the Government

to IIU and from IIU to FEI respectively.[3]

 While the conditional payment provisions of the Subcontract absolved FEI of any obligation to

pay WSI, the invoices submitted by WSI were also improper and unjustified under the Subcontract.

  2. WSI improperly front loaded its billings under the Subcontract

 WSI front loaded its billings under the Subcontract in an attempt to improperly recover

amounts it was not due.  On April 20, 2011, five days before work began installing the windows and

doors on the Project, WSI submitted its Payment Application No. 3 seeking $861,059, or 82% of the

total Subcontract value.  WSI Exhibit 45 at IIU000914-15.  As of this date, no windows or doors had

been installed on the Project and none of the invoices for which WSI seeks payment in this litigation

had even been issued.  *See* WSI Exhibits 46-50.  In addition, despite the fact that WSI invoiced for

100% for windows, doors and storm windows, as of May 5, 2011, over two weeks after the submission

---

[3] Even if IIU had received any payments from the Government, there is no evidence that any amounts were paid by IIU to FEI.  Therefore, FEI was not in breach of the Subcontract for non-payment to WSI.

of this payment application,[4] WSI acknowledged that not all such materials were on site. FEI Exhibit 25 at IIU001226.

Based on the testimony of WSI and IIU representatives, between April 25 and May 10, WSI installed 100 of the 684 windows and 12 of 66 doors within its scope. There is ample testimony that there were significant questions regarding WSI's work almost immediately. Specifically, serious questions were raised regarding the quality of WSI's work and materials supplied. At no point in the April-June 2011 timeframe did the Government approve or pay for WSI's work or supplied materials.

FEI and IIU repeatedly questioned WSI's billings in comparison to the amount of work performed on the Project. *See* FEI Exhibits 23-25. FEI and IIU requested that WSI provide support for its billings. *Id*. They also informed WSI that the Government had significant concerns regarding WSI's work and materials. *Id*. Finally, FEI and IIU informed WSI that the Government had not made payment for WSI's work or materials and that payment would not be forthcoming until it flowed down from the Government. *Id*.[5]

In response to WSI's continued threats and demands, FEI and IIU continued to take the position, as supported by the IIU-FEI Contract and the Subcontract, that no payments would be made to WSI until the deficient work was corrected and the Government made payment for such work. FEI Exhibits 30-31. Undeterred, and despite the growing concerns regarding WSI's window installation and sizing, on May 19, 2011, WSI submitted its Payment Application No. 4, seeking $962,967 or over 88% of its Subcontract value. *See* FEI Exhibit 31 at IIU000210 and WSI Exhibit 45 at IIU000918-19.

---

[4] Notably, the payment applications WSI offered into evidence at trial (WSI Exhibit 45) are unsigned, undated and uncertified. Mr. Carlson testified that WSI's Exhibit 45 are not WSI's original payment applications.

[5] Despite the legitimate concerns regarding WSI's work and materials and WSI's front loaded billings, WSI continued to push for payment, insisting without support, that it had "actually under billed [it's] actual costs." FEI Exhibit 24; FEI Exhibit 25 at IIU001226. When FEI and IIU continued to question WSI's billings, WSI began to threaten the Project. FEI Exhibit 27 at IIU000768 ("the job crashes today if we don't get paid"); FEI Exhibit 28 at IIU000190 ("[s]uffice it to say that there will be a shit**storm if we don't get our payment"). Notably, these threats occurred within weeks of its submission of Payment Application No. 3. *See* FEI Exhibits 27-28; WSI Exhibit 45.

The Contracting Officer's Technical Representative ("COTR"), Kevin Fleming, testified that the Government pays the contractor (in this case IIU) based on the percentage of work completed and the percentage of the materials incorporated into the Project.  This requirement is consistent with Section 2 of the IIU-FEI Contract and is flowed down to the Subcontract.  FEI Exhibit 9.  At the time of WSI's submission of its Payment Application No. 3, none of WSI's materials were incorporated into the Project and no work to install windows or doors had been performed.  As of WSI's submission of its Payment Application No. 4, only 100 of 684 windows had been installed on the Project and there were significant questions regarding WSI's work and materials.  While IIU attempted to submit WSI's Payment Application No. 3, Mr. Fleming testified that he rejected the billing because the amount sought was far in excess of the work performed and materials actually incorporated into the Project.

FEI and IIU's concerns regarding WSI's billings was justified under the Subcontract and IIU-FEI Contract as well as by WSI's front loading and aggressive attempts to collect.  Although WSI had a line item for windows in its Schedule of Values for $677,436 and produced an invoice from its window supplier in that amount, when IIU sought to pay WSI's window supplier directly following WSI's termination, it discovered that the cost of the windows was actually $280,000 rather than $677,436 as invoiced by WSI.  FEI Exhibits 21, 25 and 54.  WSI fails to explain why the invoices it has included in support of its damages in this litigation for the windows (WSI Exhibit 50) support the $280,000 figure rather than the $677,436 figure.[6]  While WSI's Bob Carlson testified that he had a "distributor agreement" with Malta Windows and Doors ("Malta") entitling him to a significant discount, WSI never produced this alleged agreement or offered it into evidence at trial.

At the time of the termination of FEI and WSI, the Government had not paid IIU and IIU had not paid FEI for any of the work performed and/or materials supplied by WSI and sought by WSI in its

---

[6] Notably, WSI's $677,436 invoice (FEI Exhibit 25 at IIU001228) and WSI's $280,000 invoices (WSI's Exhibit 50) were both issued in late April 2011.

Payment Application Nos. 2-4.[7]  Accordingly, pursuant to the conditional payment language of the Subcontract, including Article 5.2.4, FEI had no obligation to pay WSI.

Alternatively, FEI had a right under the Subcontract to withhold payments from WSI.  Despite repeatedly being asked for documentation to support its billings, WSI was slow to produce its invoices and never provided any documentation to prove it paid any of its suppliers.  In addition, there can be no dispute that FEI and IIU had serious concerns regarding WSI's performance of its obligations on the Project and regarding whether WSI's work conformed to the requirements of the Subcontract and the IIU-FEI Contract.  In fact, WSI's work was never approved by IIU and/or the Government.  Thus, FEI had a right under the Subcontract to withhold payment from WSI for amounts reasonably necessary to protect FEI from liability.  *See* FEI Exhibit 11, Articles 5.2.4, 5.3.1(a) and (b) and 5.3.2.

Under the Subcontract, WSI was entitled to no payments beyond the $26,000 it received.  WSI has not established by a preponderance of the evidence that it was entitled to any additional payments under the Subcontract or that FEI breached the Subcontract by failing to pay WSI.

## B.     WSI has Failed to Establish by a Preponderance of the Evidence that FEI's Termination for Default of WSI was Improper

WSI argues that FEI's termination for default of WSI was improper.  However, WSI has not met its burden of proof on this issue.  Article 9.1.1 of the Subcontract provides the grounds and procedure for terminations for default:

> If, in the opinion of FEI, [WSI] shall at any time (a) refuse or fail to provide sufficient properly skilled workers, adequate supervision or materials of the proper quality, (b) fail in any material respect to prosecute the Work according to FEI's current schedule, (c) cause by any action or omission, the stoppage or delay of or interference with the Work of FEI or of any other contractor or subcontractor, (d) fail to comply with any provision of this Subcontract or the Contract Documents … then, after serving three (3) days written notice, unless the condition specified in such notice shall have been eliminated within

---

[7] The Government did pay IIU for some of the materials supplied by WSI's suppliers at a later date.  Under the IIU-FEI Contract, following a termination for default, IIU had the right to keep monies for work performed by FEI or its lower tier subcontractors to complete FEI's scope of work.  FEI Exhibit 9, Section 10.  This issue was the subject of a motion in limine by FEI.  Despite the Court's ruling on this motion foreclosing WSI from offering evidence regarding payments sought by IIU from the Government and payments made by the Government to IIU, the Court allowed WSI to offer evidence on these issues.  Regardless of the Court's decision, there is no evidence in the record that FEI received any money from IIU as a result of the Government's payment to IIU for these materials.

such three (3) days, FEI at its option … may … (ii) terminate for default [WSI's] performance of all or a part of the Subcontract Work.

FEI Exhibit 11.

The Subcontract outlined WSI's contractual obligations in performing its work on the Project. Bob Carlson testified that he read the Subcontract and understood its provisions.  Article 2.2.1 of the Subcontract provides that "[WSI] will proceed with the Work in a prompt and diligent manner, in accordance with FEI's schedule …. Subcontractor shall be liable to FEI for failure to adhere to FEI's schedule…. TIME IS OF THE ESSENCE." *Id*.

Under Article 2.3.1 of the Subcontract WSI warranted to FEI that "all materials and equipment furnished under the Subcontract will be new unless otherwise specified, and that all work will be of the quality required by the drawings and specifications, free from faults and defects and in conformance with the Contract Documents." *Id*.

Article 2.4.1 of the Subcontract sets forth WSI's obligations and liabilities to FEI:

[WSI] hereby assumes the entire responsibility for all Work, supervision, labor and materials provided hereunder . . . until final acceptance of the Work by [IIU], and shall at all times prosecute the work in a good and workmanlike manner, with diligence and continuity.

*Id*.

Article 2.4.2 of the Subcontract defines WSI's potential liability to FEI:

[WSI] shall be liable to FEI for all costs FEI incurs or becomes responsible for as a result of [WSI's] failure to perform this Subcontract in accordance with its terms. . . . [WSI's] liability shall include but not be limited to (1) damages and other delay costs payable by FEI to [IIU] (including liquidated damages); (2) FEI's or its agents increased costs of performance, such as extended overhead and increased performance costs resulting from delays or improper work; (3) warranty and rework costs; (4) liability to third parties; (5) excess reprocurement.

*Id*.

The evidence presented at trial demonstrates that WSI consistently failed to meet its obligations under the Subcontract.  Accordingly, FEI's termination for default of WSI was proper.

1.      WSI failed to prosecute its work in a good and workmanlike manner and to complete its work without faults and defects and in accordance with the Contract Documents

After the measurements and mockups were completed, WSI began installing windows on the Project on April 25, 2011.  WSI Exhibit 23.  From the beginning, there were questions regarding the sizing of the windows supplied by WSI.[8]  Mr. Carlson testified that he never saw the actual formulas used for ordering the windows, as he only had access to a PDF version of the measurements rather than the Excel version that would allow him to check the formulas.  Mr. Carlson also testified that he only spot-checked the formulas prior to ordering the windows.  *See also* FEI Exhibit 15.

The testimony from IIU and WSI representatives was that between April 25 and May 10, WSI installed 100 windows in 2 buildings – Quarters 1 and 4.  Almost immediately, there were significant questions regarding WSI's work.  By May 10, the Government was so concerned regarding the work and the inability of the windows to open and close freely that it informed IIU that it would not be releasing additional quarters for work until the issues in Quarters 1 and 4 were resolved.  FEI Exhibit 26 at IIU000761.  Wade Benjamin of Malta testified that the significant questions regarding the installation of the windows led WSI to request that Malta technicians go to the Project site to investigate.

Between May 10 and May 19, WSI continued to work on the Project, presumably to correct deficiencies in the windows in Quarters 1 and 4.  FEI Exhibit 58 at WSI359-61.  At this point, the Government was sufficiently concerned regarding the quality of the work that it was considering terminating IIU.  FEI Exhibit 28 at IIU000191.  FEI's Keith Forney testified that the Government demanded a meeting with the Contracting Officer, the COTR, IIU, FEI and WSI.  Mr. Forney testified

---

[8] WSI's Mr. Carlson testified that measurement and ordering of the windows on the Project was a complex process which required measurements, imputing measurements into a spreadsheet and then using a formula to determine the size of the windows to order.  *See also* FEI Exhibit 14 at WSI1486.  Mr. Carlson was very concerned about this process on the Project.  *Id.*; FEI Exhibit 8 at WSI1901-1902.  He emphasized to his staff that "[w]rong orders cost a lot of money and cause schedule disruption and unhappy customers."  FEI Exhibit 8 at WSI1902.

that on May 19, 2011 the Government held a meeting at the Contracting Officer's office to discuss the deficiencies in Quarters 1 and 4. *Id.* At this meeting, the Government identified a number of issues with the quality of the work. Specifically, Mr. Forney testified that the Government expressly informed all parties that the windows in Quarters 1 and 4 were not operating properly and expressed concerns regarding the accuracy of the window measurements and the sizing and quality of the windows supplied by WSI. *See also* FEI's Exhibit 31 at IIU000205.

> 2. WSI failed to proceed with its work in a prompt and diligent manner in accordance with FEI's schedule and to provide sufficient properly skilled workers and adequate supervision to complete its work

On May 25, 2011 the Government issued IIU a 10-Day Cure Notice. FEI Exhibit 33. This Cure Notice identified a number of issues regarding the windows. In this Notice, the Government included an e-mail it received from Malta, wherein it raised a number of issues regarding the storage of the windows, the installation of the windows and the sizing of the windows. *Id.* As to sizing, the Cure Notice provided: the "[w]indow manufacturer claims that many windows were not measured correctly and will not function in their current state." *Id.*

Despite the Government's complaints and ample evidence to the contrary, WSI continued to attempt to minimize the issues and insist that its windows were operating properly and sized correctly. FEI Exhibit 34-35. WSI acknowledged to FEI and IIU that WSI must "build down" the openings to accommodate any inconsistencies in the openings and ensure the Project "look[ed] good." FEI Exhibit 35. Indeed, WSI's representatives testified that during the second mock up, they built down the opening to ensure the window was installed properly.

In response to the Cure Notice, the testimony from IIU's Frank Ukoh and WSI's Bob Carlson was that WSI would take the lead in drafting the response. WSI developed the response to the Cure Notice, which it circulated to FEI and IIU. FEI Exhibits 36-37. Notably, WSI's plan stated that it

would "install filler strips at the head to accommodate any further adjustment because of out of square openings." FEI Exhibit 37 at IIU001592.

        a.       WSI's actions following the recommencement of work on the Project

       Following submission of the response to the Government's Cure Notice, the testimony from Mr. Ukoh and Mr. Carlson was that work on the Project ceased while the Government reviewed and approved the plan to move forward. Work recommenced during the week beginning June 20, 2011. *See* FEI Exhibit 58 at WSI371. However, instead of showing up on site with a full work force ready to remedy its work, WSI showed up with little to no manpower and no supervision.

       On June 20, WSI had no manpower on site and on June 21, it had two men on site. *Id.* IIU's Frank Ukoh testified that WSI's field operations manager, Greg Jones, was not on site on those days. On June 21, IIU informed FEI that it was concerned that WSI was not getting the job done. FEI Exhibit 41 at IIU000873. FEI immediately forwarded IIU's concerns on to WSI and noted that IIU was going to be issuing a notice of termination to FEI. *Id.* Later that day, IIU did in fact issue a Notice of Termination to FEI, directing it to cure its deficiencies or be terminated. FEI Exhibit 40.

        b.       FEI's Cure Notice to WSI and WSI's actions after this Cure Notice

       On June 24, 2011, FEI issued WSI a 3-Day Cure Notice pursuant to Article 9.1.1 of the Subcontract, citing WSI's failure to provide sufficient properly skilled manpower and supervision to complete its work and failure to complete its work in accordance with the schedule. FEI Exhibit 42. FEI pointed out that WSI had not taken the corrective actions promised and that it should have started work on June 20, but had not. *Id.* FEI's Cure Notice to WSI was proper under the Subcontract given WSI's failure to provide adequate manpower and supervision, failure to comply with FEI's schedule, including cure periods and failure to provide quality work and materials.

       On June 27, the first business day following FEI's Cure Notice, WSI had two men on site. FEI Exhibit 58 at WSI373. IIU's Frank Ukoh testified that he spoke with WSI's field operations manager,

Greg Jones, and Mr. Jones asked IIU to provide a carpenter to assist with the remedial work on the windows.  Mr. Ukoh testified that IIU provided a carpenter as well as some painters.  Mr. Ukoh testified that on June 27 WSI had a crew on site, but that this crew was not doing anything productive.

On the morning of June 27, IIU informed FEI and WSI that the corrective measures were not working, as the windows were reinstalled and trimmed correctly, but were still not operating properly.  FEI Exhibit 44.  Later that same day, IIU again e-mailed FEI and WSI and noted that the windows were not operating properly, that WSI had failed to fulfill its promise to provide more manpower to the Project and that WSI had failed to get Malta representatives to the Project site as promised, which had angered the Government representative.  FEI Exhibit 45 at IIU000884.

On June 28, 2011, the second day of the cure period, WSI was on site with one person.  FEI Exhibit 58 at WSI373.   Mr. Ukoh testified that at WSI's request, Malta individuals did come to the Project site that day to inspect the installation of the windows in Quarters 1 and 4.

On June 29, 2011, the third and final day of the cure period, WSI had one man on site.  *Id*.  On this third day of the 3-day cure period, WSI's Bob Carlson finally responded to IIU's two e-mails from June 27, 2011 (the first day of the cure period).  *See* FEI Exhibits 44-45.  In those e-mails and even at trial, WSI failed to offer any explanation for its failure to timely respond to IIU and FEI's June 27 e-mails or to provide sufficient manpower and supervision during the 3-day cure period to correct the deficiencies in the window installation.

On June 29, Malta provided IIU a letter documenting its findings from its June 28 visit to the Project site.  FEI Exhibit 46.  Malta's letter questioned a number of issues with the windows, including the installation of the windows and jambliners, the functioning of the windows and the sizing of the windows.  *Id*.  These were many of the same issues that had been identified by the Government and discussed with all parties, including WSI, at the Government's May 20 meeting.

        c.      IIU's termination for default of FEI and FEI's termination for default of WSI

As a result of FEI/WSI's failure to adequately address issues with the deficient window installation during the cure period as well as the issues identified in Malta's June 29 letter, IIU terminated FEI. FEI Exhibit 43. IIU's Frank Ukoh and the Government's Kevin Fleming both testified that at this point, IIU was in danger of being terminated for default by the Government and needed to make a change if it did not want to be terminated. *See also* FEI Exhibits 50-51. FEI forwarded the Termination Notice to WSI and instructed WSI not to perform additional work on the Project. FEI Exhibit 47. FEI later provided WSI with a formal termination letter. FEI Exhibit 56.

FEI's termination for default of WSI was proper under the Subcontract given IIU's termination for default of FEI under the IIU-FEI Contract due to WSI's deficiencies. In addition, FEI's termination for default of WSI was proper under the Subcontract due to WSI's failure to: (1) prosecute its work in a good and workmanlike manner; (2) proceed with its work in a prompt and diligent manner in accordance with FEI's schedule, including the applicable cure periods; (3) provide sufficient properly skilled workers and adequate supervision to complete its work in accordance with FEI's schedule, including the applicable cure periods; and (4) provide materials for the Project that were of the proper quality required by the Contract Documents.

WSI's testimony that during the cure periods, the majority of the work required to be performed was within IIU's scope, is simply not credible. Bob Donnelly and Bob Carlson both testified that the alleged problem with the demolition – the replacement of an erroneously removed head stop – was an "easy fix." In contrast, in order to remedy the windows in Quarters 1 and 4, WSI needed to remove each and every one of the 100 windows installed so that IIU could perform its "easy fix" and replace the head stop followed by WSI reinstalling each of these 100 windows.

WSI had between 0-2 men on site during the relevant cure periods, which is not enough to perform this scope of work. WSI's Mark Whittoff testified that he received no specific instruction

regarding how to remedy the installed windows.  Consistent with Mr. Ukoh's testimony, WSI's Mark

Whittoff testified that during the cure period he was simply taking the old windows out and then

putting them back in without any further work.  Mr. Whittoff's testimony acknowledges that WSI did

not build down the openings to ensure proper installation of the windows (*see also* FEI Exhibits 34-35)

and that he did not remove the insulation from behind the jambliners, which he also testified was

causing the windows to operate improperly.  Although Mr. Whittoff testified that he knew WSI was

"on the clock," during the cure period, WSI did nothing during the cure period to remedy its deficient

work and materials.

Despite being given a number of opportunities to cure its deficiencies, WSI failed to cure its

deficient work and provide functioning and properly installed and sized windows and doors in Quarters

1 and 4 in accordance with the Subcontract requirements and in compliance with FEI's schedule and

the applicable cure periods.  WSI's lack of supervision is further demonstrated by the fact that WSI's

Bob Carlson testified that he never came to the Project between the Government's May 25 Cure Notice

and WSI's termination and WSI's field operations manager, Greg Jones, failing to appear on site

during critical times of the cure periods.  WSI's lack of manpower and failure to meet the schedule is

demonstrated by the fact that during the weeks of June 20 and June 27, the beginning of the remedial

work following the Government's Cure Notice and the cure period respectively, WSI never had more

than two men on site a day, and on some days had no manpower.

> 3.     WSI failed to provide materials that were of the proper quality required by the
> Contract Documents

Prior to FEI/WSI's termination on the Project, there was ample suggestion that the windows in

Quarters 1 and 4 did not operate properly.[9]  There were also significant questions regarding the sizing

of these windows.  *See* FEI Exhibits 31 at IIU000205 and FEI Exhibit 32.  These issues were raised in

---

[9] There was also evidence that there were problems with the finishes on the windows.  WSI's Mark Whittoff
testified that Malta's representatives that came to the site to remedy the deficient finishes on the windows did not want to
be there because they knew it would take months to fix the problems.

the Government's May 25 Cure Notice, at the Government's May 19 meeting with the parties and in Malta's June 29 letter to IIU.  *See* FEI Exhibits 33 and 46.

Following FEI/WSI's termination, it was confirmed that the windows were sized incorrectly. Bob Donnelly performed an inspection of the windows in Quarters 1 and 4 and confirmed that they were sized incorrectly and did not function properly.  FEI Exhibit 52.  Specifically, Mr. Donnelly found that:

> Out of the forty nine double hung windows in each of these first two Quarters 1&4 (total then being 98 windows in all, plus 12 fixed units), only two windows were found to function properly, and we found only three windows in Quarters one out of the total of 55 windows that were sized right:  most were to [sic] short, some to [sic] wide, many to [sic] narrow, many narrow and short.

*Id.* at IIU000003.  Mr. Donnelly testified that all of the windows supplied by WSI and installed in Quarters 1 and 4 were sized improperly.  He also testified that the remainder of the windows supplied by WSI, which were still in storage, were undersized as well.

Mr. Donnelly also inspected the 12 doors installed in Quarters 1 and 4 by WSI and found significant deficiencies.  Mr. Donnelly found that:

> First, the doors were sized wrong:  All the doors were to [sic] narrow for the openings there were scheduled to fit into, which some as much as 7/16 of an inch to [sic] narrow: That's almost a ½''.  This left enormous gaps on the sides of the doors where wind and light freely entered the residences:  Some doors were worse than others, all were incorrect . . . Door heights were also wrong, creating door sweep problems.  Compare the original door sizes ordered to the ones we replaced them with.

*Id.* at IIU000001.  Mr. Donnelly testified that all of the doors supplied by WSI and installed in Quarters 1 and 4 and those doors that were not yet installed and still in storage were all incorrect and could not be used.  Mr. Donnelly also found significant issues with the locks, strike plates and door jambs, door sweeps and hinges[10] for the doors and noted that none of these items could be reused.  *Id.*

---

[10] Mr. Donnelly testified that on one door installed by WSI, he discovered that the hinge screws had broken off when they were installed.  Instead of fixing this problem, the installer simply glued the broken screw heads in place so it looked secure.  Given the size and weight of these doors, Mr. Donnelly testified that this installation created a significant safety hazard.  *See also* FEI Exhibit 52 at IIU000002.

While there was conflicting evidence offered by WSI regarding its window measurements and the sizing and installation of the windows, FEI submits that the contemporaneous documentation from the unbiased third parties – Bob Donnelly and Malta's service technicians – demonstrates that the windows were in fact not sized correctly.  Bob Donnelly testified that he did not know or care who performed the demolition of the existing windows and who performed the installation of the new windows.  He did however, unequivocally testify that the issues with the sizing and operation of the windows were not the result of improper demolition.  To the extent demolition was an issue with the windows, Mr. Donnelly testified that it was an "easy fix."  This is consistent with WSI's Bob Carlson's testimony as well.

Questions regarding the sizing and installation of the windows supplied by WSI is also consistent with Malta's e-mail to the Government which became part of the Government's Cure Notice.  FEI Exhibit 33.  Citing Malta's e-mail to the Government, the Cure Notice provides:

- Upon reviewing the stored windows, that the "sash had not been handled or maintained the way they should be . . . [the windows] were stacked on top of each other as well as stacked next to each other with the locks open causing damage to the sash behind it."

- "[P]oor installation was the first thing we noticed followed by the sash being undersized."

- WSI's Mark Whittoff acknowledged that "installation [of the windows] wasn't up to par as it could have been."  Quoting Mr. Whittoff as stating that he "could have spent a little more time shimming the sash in to get it more square."

- "Some windows would be considerably square whereas some would have a 2'' space from the sill to bottom of the glazing stop on one side and have a 2 ¾'' space on the other side."

- When discussing Malta's opinions, WSI's Mark Whittoff stated to a Malta representative that "your best bet is to keep your mouth shut because this is going to cost your boss and my boss money."

*Id.* at IIU003179-003180.  The Cure Notice also provided that the "[w]indow manufacturer claims that many windows were not measured correctly and will not function correctly in their current state."  *Id.* at IIU003180.  There is no reason to question the credibility of these unbiased statements from Malta personnel.

17

Malta's e-mail that became part of the Government's Cure Notice is also consistent with

Malta's findings in its June 29, 2011 letter to IIU, which provided the following:

- "Multiple issues were caused by incorrect measurements."

- "The clips on the jambliners were not installed properly, some were crooked and should have been installed square."

- "After leaving the first house to inspect another, our service techs returned to the first house and found that the installation crew had switched sash out from window to window.  We asked why the change was made and got no explanation."

- "While inspecting unit 15, we were checking measurements with Kevin and Frank it was discovered that several original windows were painted shut which makes us question how measurements were taken to order windows."

- Upon inspecting the window that "came the closest to being installed properly," Malta's techs advised that "if the measurements were correct, jambliners were installed properly, and removal of original windows was done properly, the new windows would all operate great."

FEI Exhibit 46.

Notably, neither of these communications was generated by Malta's Wade Benjamin.  Mr.

Benjamin's opinions on the window installation and sizing, apparently based on a single brief trip to

the Project site, differ significantly from the opinions of Malta's service technicians who visited the

site on more than one occasion.  It is not unreasonable to think that Mr. Benjamin's loyalties to WSI's

Mr. Carlson, a significant Malta shareholder, influenced his opinions regarding the windows.[11]

However, the unbiased opinions from Bob Donnelly and Malta's representatives other than Mr.

Benjamin are consistent – that the windows were not sized correctly.

---

[11] Mr. Benjamin testified that he went to the Project site to investigate the windows following an in-person meeting with Bob Carlson at WSI's offices in mid-May 2011.  Following his investigation at the Project site, Mr. Benjamin's original opinion was that the windows were undersized and improperly installed.  He testified that he subsequently changed his opinion because he learned that WSI was responsible for the ordering and installation of the windows and IIU for the demolition and finishes.  It strains credulity that if Mr. Carlson felt the problem on the Project was IIU's demolition (or the alleged instruction to install insulation behind the jambliners) that Mr. Carlson would not inform Mr. Benjamin of these potential issues, or of WSI and IIU's respective roles, before his investigation.

4.     The contemporaneous Project documents and credible testimony demonstrate that demolition was not the cause of the deficient window installation on the Project

WSI asserts that the problems with the installation and sizing of its windows was due to IIU's demolition work.  However, when the testimony offered by WSI at trial is analyzed in light of the contemporaneous Project documents, or lack thereof, WSI's testimony is simply not credible.  Close analysis of the evidence demonstrates that WSI never raised in writing the two primary issues (demolition and insulation) it now argues excuse its performance until <u>after</u> it installed 100 windows.

Article 13. 2 of the Subcontract provides a clear procedure for WSI to address issues with predecessor work, including IIU's demolition:

[WSI] shall review the critical dimensions and elevations of its Work, and verify the previous Work as to its relationship to [WSI's] Work.  [WSI] shall promptly submit a written statement to FEI noting any discrepancies or unacceptable conditions prior to commencing with the Work of this Subcontract.

FEI Exhibit 11.  The undisputed facts demonstrate that WSI installed 100 windows into openings that it now claims were improperly demolished without providing the required written notice.

A contractual requirement to provide written notice is a condition precedent.  *See U.S. v. Cunningham*, 125 F.2d 28, 31 (D.C. Cir. 1941).  Failure to satisfy a condition precedent results in a waiver of the right associated with the subject of the clause.  *See Sun Secured Financing, L.L.C. v. ARCS Commercial Mortg. Co. L.P.,* 730 F. Supp. 2d 132, 139-140 (D.D.C. 2010).  Clauses requiring written notice are interpreted as a condition precedent "compliance with which must be shown," and it must be assumed that the insertion of the written notice requirement carries "value and importance to its precise terms" to the parties.  *Cunningham,* 125 F.2d at 31.  Written notice clauses will be enforced particularly when lack of written notice will cause the intended recipient of the notice to be prejudiced.  *See AAB Joint Venture v. U.S.*, 75 Fed. Cl. 414, 424-25 (Ct. Cl. 2007).

WSI's Bob Carlson repeatedly testified that he provided written notice of IIU's improper demolition in "17 e-mails."[12]  At trial, Mr. Carlson could not point to one e-mail that was written prior to WSI's installation of 100 windows on the Project that identified demolition as an issue.  That is because none exist.  Project documents demonstrate that WSI first addressed the issue of demolition in a May 20, 2011 e-mail.  FEI Exhibit 31 at IIU000207.  Importantly, this e-mail was sent after the May 19, 2011 meeting with the Government where this issue was first raised by the Government (and apparently not WSI) after WSI had already installed 100 windows.

The most logical and reasonable explanation for WSI's failure to provide written notice regarding IIU's demolition was that it was not a significant problem.  Given Mr. Carlson's propensity to write numerous and substantial Project e-mails, if in fact IIU's demolition work affected WSI's work, one would expect this issue to have been raised in an e-mail prior to May 20, 2011.  It defies logic that an experienced window installer like WSI would install 100 windows time and time again in openings that it deemed unfit and not provide written notice.  When pressed on the question of why WSI installed 100 windows in openings it deemed improperly demolished, WSI's Bob Carlson simply stated "it's a mystery."

Even if it is contended that immediate written notice was not possible, it is unreasonable and in violation of the Subcontract to keep installing window after window, day after day, when WSI claims the demolition of the windows impacted the operation of its windows.  Failure to do so greatly prejudiced IIU's ability to correct any alleged deficiency.  A reasonable contractor would have stopped installing the windows.  Wade Benjamin of Malta and Bob Donnelly both testified that they would not install windows in openings that they felt were deficient.  Alternatively, a reasonable contractor would

---

[12] WSI also offered testimony that it provided oral notice to IIU representatives at the Project site of the alleged issues with IIU's demolition.  However, oral notice will not be accepted in lieu of written notice when written notice is required by the contract.  *See Sun Secured Financing, L.L.C.*, 730 F.Supp.2d at 138-39; *Int'l Tel. & Tel., ITT Defense Communications Div. v. U.S.*, 453 F.2d 1283, 1289-90 (Ct. Cl. 1972).

provide written notice of the alleged improper demolition and document the conditions with numerous photographs.[13]  WSI did neither.

That IIU's demolition of the windows was not a significant problem is also supported by WSI's Bob Carlson and Bob Donnelly's testimony that any problems with IIU's demolition (the removal of some head stops) was an "easy fix."  Importantly, Frank Ukoh testified that demolition was not done on the sides of the window openings, and thus demolition could not account for the gaps on the sides of the windows that were consistently complained of by the Government and noted by Malta and Mr. Donnelly.  That the window sizing rather than the demolition was the problem is also consistent with WSI's Mark Whittoff's statement to IIU's Frank Ukoh on the last day of the cure period that the problems with the window "must be an engineering problem."

While there may have been some issues with IIU's demolition, it is clear that such issues were minor compared to WSI's failures.  Proportionally, IIU's demolition of the windows was a relatively small portion of the work (in terms of value, time and responsibility) compared to WSI's supply, installation and correction of the operation of the windows.  Careful review of the facts and contemporaneous Project documents demonstrate that WSI has, after the fact, attempted to manufacture a defense to excuse its deficient performance.[14]  WSI has not met its burden of proof in establishing by a preponderance of the evidence that IIU's demolition was the cause of WSI's deficiencies on the Project.

_____

[13] Notably, WSI did not produce any photographs in response to FEI's discovery requests in this litigation despite the fact that WSI representatives testified that they took many photos. WSI came forward with a small number Project photographs for the first time at trial.  However, these few photographs did not illustrate any significant issues with the demolition.  If demolition was truly the issue, it would have been documented in some of the hundreds of photographs that Mr. Whittoff testified were taken by Mr. Jones of WSI.

[14] This is similar to WSI's argument regarding the installation of insulation behind the jambliners, which is not credible.  The Government's Kevin Fleming testified that he did not direct WSI to install insulation behind the jambliners. There was never any written notice by WSI that insulation behind the jambliners was a problem, even though WSI's Mark Whittoff now claims that this was done from the very beginning of the Project and he knew that installation of insulation would impact the operation of the windows.  As with the demolition issues, there is no contemporaneous Project documentation indicating that WSI complained about the insulation until the issue was raised by Malta in its June 29, 2011 letter to IIU.

### C.       WSI has not Met its Burden of Proof in Establishing its Damages

Even if WSI can establish that FEI breached the Subcontract and/or terminated WSI for default

improperly, WSI has not met its burden in proving its damages by a preponderance of the evidence.

Section 10 of the IIU-FEI Contract provides the default procedures of that contract:

> (i) Should [FEI] fail to rectify any contractual deficiencies . . . within three (3) working
> days from receipt of [IIU's] written notice, [IIU] shall have the right to take whatever
> steps it deems necessary to correct said deficiencies and charge the cost thereof to [FEI],
> who shall be liable for the full cost of [IIU's] corrective action, including overhead, profit
> and actual attorneys' fees. (ii) [IIU] may at any time and for any reason terminate [FEI's]
> services hereunder at [IIU's] convenience.  In the event of termination for convenience,
> [FEI] shall recover only the actual cost of work completed to the date of termination, in
> approved units of work or percentage of completion, plus fifteen percent (15%) of the
> actual costs of the completed work for overhead and profit.  [FEI] shall not be entitled to
> any claim or lien against [IIU], the Owner or anyone else for any additional compensation
> or damages in the event of such termination.

FEI Exhibit 9.  Mr. Ukoh testified that the costs to complete FEI/WSI's scope of work following

the termination of FEI exceeded the remaining balance of the IIU-FEI Contract.  Thus, IIU had

no obligation to make any payments to FEI following the termination for default of FEI.

The Subcontract sets forth the procedure for termination for default between FEI and WSI.

Specifically, Article 9.1.2 provides, in part:

> In the case of termination for default, [WSI] shall not be entitled to receive any further
> payment until the Work shall be fully completed and accepted by [IIU] and payment in
> full made by [IIU].  At such time, if the unpaid balance of the price to be paid shall
> exceed the expense incurred by FEI, including overhead and profit, such excess shall be
> paid by FEI to [WSI].  If such amount shall exceed such unpaid balance, [WSI] shall
> pay FEI the difference on demand.

Given that IIU owed nothing to FEI under the IIU-FEI Contract following termination for default, FEI

owed nothing to WSI under the Subcontract following its termination for default of WSI.

Under the Subcontract, if FEI's termination for default of WSI is deemed improper, the

termination for default is converted into a termination for convenience.  Article 10.1 of the Subcontract

provides:

FEI shall have the right to terminate for convenience [WSI's] performance of all or any part of the Work by providing [WSI] with written notice of termination for convenience, to be effective upon receipt by [WSI].  If there has been a termination of FEI's Contract with [IIU], [WSI] shall be paid the amount due from [IIU] for its Work, as provided in the Contractor Documents, after payment therefore by [IIU] to FEI.  If FEI's Contract has not been terminated, [WSI] shall be paid the reasonable value of the Work performance by [WSI] prior to termination plus reasonable direct close-out costs, including jobsite overhead and profit on Work performed, but in no event shall [WSI] be entitled to unabsorbed overhead, anticipatory profit or damages of any kind or nature, direct or indirect, incidental or consequential.

FEI Exhibit 11.  Given that FEI was not due anything by IIU for WSI's work under the IIU-FEI Contract, FEI had no obligation to make any additional payments to WSI.  *See* Section III.A. *supra*.

Even if FEI's termination for default of WSI is deemed improper and WSI can establish that it is due compensation for the work performed and materials supplied, WSI has not met its burden of proof in establishing its damages by a preponderance of the evidence under a termination for convenience.  If a party establishes breach of contractual duty but fails to show actual damages or the proof of his damages is vague or speculative, he is entitled to no more than nominal damages.  *Cahn v. Antioch University*, 482 A.2d 120, 130 (D.C. 1984); *FCE Benefit Adm'rs, Inc., v. George Washington University*, 209 F. Supp. 2d 232, 243 (D.D.C. 2002).

To prove its damages, WSI relies on scant documentation and brief testimony from Bob Carlson.  The documentary evidence put on by WSI includes only invoices from its suppliers and its payment applications.  WSI Exhibits 45-50.  Notably, there is no documentary evidence in the record, including canceled checks or job cost reports, to indicate that WSI actually paid any of its suppliers.[15]  Further, there is no documentary evidence in the record that any of these suppliers have asserted any claims against WSI for these outstanding amounts.  Notably, none of the invoices for which WSI is seeking payment in this litigation contain payment terms.  *See* Exhibits 46-50.

---

[15] There is however, evidence in the record that IIU paid Malta and Diamond Doors, Ltd. all amounts due for materials they supplied.  Diamond Doors and Malta accepted IIU's payment and executed a final waiver and release of all claims in favor of IIU, FEI and WSI.  FEI Exhibits 54-55.  WSI owes no monies to Malta or Diamond Doors.

As to documentary evidence, WSI appears to rely almost exclusively on its Schedule of Values and its unsigned, undated and uncertified payment applications.  WSI Exhibit 11 at IIU001671 and WSI Exhibit 45.  WSI asserts that its Schedule of Values was "approved" by IIU and FEI and establishes its right to payment for amounts included in Payment Application Nos. 2-4.  This is not the case.

FEI offered expert testimony from Robert Peterson, an expert in construction cost accounting and damages.  Mr. Peterson's expert qualifications were stipulated to and his testimony was unrebutted by any expert or witness of WSI.  Mr. Peterson testified that a Schedule of Values is merely a billing tool and that billing based on a Schedule of Values alone does not entitle a contractor to payment.  Mr. Peterson also testified that it is not sufficient for a contractor to seek recovery following a termination for default or a termination for convenience based exclusively on a Schedule of Values because the Schedule of Values does not represent actual or reasonable costs incurred by the contractor.[16]

Mr. Peterson also testified regarding documentation expected and necessary to support and justify costs/damages, which he termed "source documents."  WSI has not provided any "source documents" to support the amounts it seeks in this litigation.  While WSI provided its payment applications and vendor invoices, Mr. Peterson testified that critical and necessary documentation, including purchase orders/contracts for work/materials, canceled checks, job cost reports or other accounting documents to indicate that the costs had actually been incurred by WSI were not present.  Importantly, WSI's Bob Carlson testified that WSI maintained such "source documents."  WSI simply failed to produce these documents or offer them into evidence at trial.[17]

---

[16] Consistent with Mr. Peterson's opinion, Article 5.1.2 of the Subcontract provides that WSI's Schedule of Values "will be used only as a basis" for WSI's payment applications.  It is not to be used to support recovery following a termination.

[17] The logical explanation for WSI's failure to produce these documents and/or offer into evidence at trial such documents is that WSI's "source documents" do not support the damages WSI seeks in this litigation.

Mr. Peterson further testified that WSI failed to provide any documentation to support its claims for field labor, including timesheets or timecards reflecting hours actually worked by its field personnel and canceled checks or job cost reports indicating that it actually paid its field personnel. Again, Mr. Carlson testified that such documents are maintained by WSI, but WSI did not offer such documents into evidence at trial.

As to home office overhead, Mr. Peterson testified that WSI provided no source documentation of the costs incurred by WSI for the various components of WSI's home office overhead including job cost reports or canceled checks indicating amounts paid for these items. This is despite the fact that Mr. Carlson testified that WSI's costs and revenues were analyzed and audited by a CPA firm which provided WSI with a report regarding WSI's financials, including its overhead costs. Mr. Carlson's unsupported and unsubstantiated testimony regarding amounts incurred by WSI for field labor, office labor and home office overhead are simply not sufficient to support WSI's damages in this case. *See Fireman's Fund Ins. Co. v. U.S.*, 92 Fed. Cl. 598, 704 (Ct. Cl. 2010).

WSI has not met its burden of proof to establish by a preponderance of the evidence that it is due any monies from FEI under a termination for default or a termination for convenience. As a result, WSI's claims against FEI and Hanover must be denied in their entirety.

**D.      FEI is Entitled to the Lost Profits it Suffered as a Result of WSI's Failures**

FEI's Keith Forney testified that he was terminated by IIU as a result of WSI's failures and deficiencies in performing its work on the Project. Mr. Forney also testified that he suffered $75,000 in lost profits he would have made on the IIU-FEI Contract had FEI not been terminated by IIU.   FEI is entitled to recover this $75,000 from WSI in this litigation.

**E.      There is no Basis for WSI's Attempt to Resurrect its Quasi Contract/Unjust Enrichment Claim Against FEI that was Previously Dismissed by the Court[18]**

By order dated December 2, 2011, the Court dismissed Count II of WSI's Complaint for quasi-contract/unjust enrichment.   On the first day of trial, WSI asserted that it had located case law suggesting that its count for quasi-contract/unjust enrichment should not have been dismissed.  FEI disagrees.  The case law on this issue is clear.   *See Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C.1997) ("[T]here can be no claim for unjust enrichment when an express contract exists between the parties.").  There is no dispute that there is an express contract between WSI and FEI.  WSI's new found cases do not support overturning the Court's previous ruling.

WSI attempts to reargue that it may bring claims for both breach of contract and unjust enrichment claims against FEI.  In support of this argument, WSI relies on *Coastal Steel Erectors, Inc. v. Algernon*, 479 F.2d 638, 641 (4th Cir. 1973).  *Algernon* included a plaintiff who brought claims for breach of contract and unjust enrichment against both the prime contractor and the prime contractor's surety.  *Id*. at 640.  In the case at bar, WSI alleged breach of contract and unjust enrichment against FEI, but did not do so against Hanover.  Indeed, under Count II of its Complaint, WSI identified Quasi-Contract/Unjust Enrichment only "AS TO FEI" and prayed for judgment against only FEI.

WSI also relies on *Mariana v. Piracci Construction Co., Inc.*, 405 F. Supp. 904 (D.C. Cir. 1975) in support of its argument.  *Mariana* involves a subcontractor who, after completion of a project and after being paid the full contract price, sued the prime contractor and its surety for recovery of delay costs, including increased labor and material costs.  *Id.* at 906.  Again, WSI's only claim for quasi contract/unjust enrichment was against FEI, not Hanover.  There is nothing in *Mariana* to suggest that WSI is entitled to revive its cause of action for quasi contract/unjust enrichment against FEI.

---

[18] Although the page limit for the Post-Trial Briefs is 25 pages, in the interest of economy, FEI has elected to respond to WSI's argument to reinstate its quasi-contract/unjust enrichment count in a single page as part of this brief rather than as part of a separate motion.

## IV.     CONCLUSION

For the reasons set forth herein and at trial in this matter, FEI and Hanover respectfully request that WSI's claim be denied in its entirety and that FEI be awarded its costs and attorneys' fees.   FEI also respectfully requests that it be awarded $75,000 for its counterclaim against WSI, plus interest, costs and attorneys' fees.

August 11, 2014                                            Respectfully submitted,

                                                           FORNEY ENTERPRISES, INC. and
                                                           HANOVER INSURANCE COMPANY


                                                           /s/ Jason C. Constantine
                                                           Robert D. Windus (Bar No. 436660)
                                                           Jason C. Constantine (Bar No. 989443)
                                                           MOORE & LEE, LLP
                                                           1751 Pinnacle Dr., Suite 1100
                                                           McLean, Virginia 22102-4225
                                                           (703) 506-2050 Telephone
                                                           (703) 506-2051 Facsimile
                                                           r.windus@mooreandlee.com
                                                           j.constantine@mooreandlee.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of August, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Shawn C. Whittaker
WHITTAKER & ASSOCIATES, P.C.
1010 Rockville Pike, Suite 607
Rockville, MD 20852
*Counsel for Window Specialists, Inc.*

/s/ Jason C. Constantine
Jason C. Constantine