UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
WINDOW SPECIALISTS, INC.,                            )
                                                    )
            Plaintiff,                               )
                                                    )
      v.                                             )        Civil Action No. 11-1610 (RMC)
                                                    )
FORNEY ENTERPRISES, INC., *et al.*,                  )
                                                    )
            Defendants.                              )
_____                       )

## OPINION

This case involves claims between Window Specialists, Inc. (WSI) and Forney Enterprises, Inc. (FEI). FEI, a subcontractor on an Army project at Fort McNair in Washington, D.C., contracted with WSI for the installation of windows and doors on the project. The Army found deficiencies and when the deficiencies remained uncured, FEI and WSI were terminated. WSI sues for breach of contract and unjust enrichment, claiming that it was wrongfully terminated because the deficiencies were caused by the prime contractor, not WSI. FEI countersues for breach of contract, seeking lost profits.

The parties agree that the Army identified deficiencies with regard to the window installation on the Project; that the deficiencies were not corrected; that the prime contractor terminated FEI; and that FEI terminated WSI. The question of whether FEI or WSI is liable to the other is a matter of dispute. A bench trial was held from July 14 through 21, 2014, and the parties submitted post-trial briefs. Based on the entire record, the Court determines that WSI breached the WSI/FEI Subcontract and thus FEI is excused from payment. Even though WSI breached, FEI will be awarded only nominal damages because it failed to prove lost profits.

1

# I. FINDINGS OF FACT

Based on the entire record, including the credibility of the witnesses, the Court makes the following findings of fact:

## A. Contracts for Work on the Project

1. The U.S. Army decided to improve historic homes for officers at Fort McNair in Washington, D.C., namely Quarters 1, 3 through 13, and 15 (the Project).[1] Pl. Ex. 1 (Prime Contract) at 4.

2. On September 22, 2010, the Army hired IIU Consulting Institute, Inc. (IIU) as its general contractor on the Project. Pl. Ex. 1 (Prime Contract).[2] The Army and IIU executed the Prime Contract, which required IIU to provide labor and materials for the installation of windows and doors, for the cost of $1,678,889. *Id*. at 1-2. The Prime Contract noted that the Quarters are "Historic Category III Facilities and exterior repairs must comply with the National Capital Planning Commission requirements." *Id*. at 4.

3. The Prime Contract required the installation of "window sash units" that "shall be vinyl (PVC) or aluminum wrapped wood" and "jambliner in heavy duty white vinyl." Prime Contract at 4. The Prime Contract required the "installation of new window sashes plumb and square." *Id*. at 5.

---

[1] While page 1 of the Prime Contract includes Quarters 2 in the statement of "required work," page 4 expressly excludes Quarters 2 from the defined "Scope of Work." The WSI/FEI Subcontract also specifically excludes Quarters 2. *See* Pl. Ex. 17 (WSI/FEI Subcontract), Ex. A.

[2] The majority of the exhibits presented at trial by FEI were identical to those already submitted by WSI, but numbered differently. For all identical exhibits, the Court cites WSI's exhibit number.

4.      The Miller Act, 40 U.S.C. §§ 3131-3134, requires a payment and performance bond on all federal government construction projects costing over $100,000.  IIU applied for a bond with Hanover Insurance Company (Hanover).  Pl. Ex. 5 (Application for Bond).

5.      IIU asked FEI to assist in obtaining the bond, and FEI agreed to do so for a fee.  *See* Pl. Ex. 2 (Forney Email 10/18/10); Pl. Ex. 16 (Carlson Email 1/10/11) ("FEI provided the bonding . . . the third week of December.").

6.      IIU, as principal, and Hanover, as surety, entered into a bond agreement.  *See, e.g.*, Compl. [Dkt. 1], Ex. 1 (Performance Bond 12/17/10).  Under the standard terms of such a bond, the principal and the surety agree to be bound jointly and severally.  *Id.*

7.      FEI and its President, Keith Forney, were indemnitors on the bond.  Tr. 7/21/14 at 49 (Forney).[3]

8.      In October 2010, IIU proposed that WSI subcontract for the installation of the windows and doors on the Project for the price of $961,482.  Pl. Ex. 3 (Letter of Intent).  A subcontract on these terms was drafted but never executed.  Pl. Ex. 4 (Unexecuted Subcontract).  The Unexecuted Subcontract parroted the language of the Prime Contract and called for the installation of "window sash units" that "shall be vinyl (PVC) or aluminum wrapped wood" and "jambliner in heavy duty white vinyl."[4]  *Id.* at 2.

---

[3] The trial lasted five days and the court reporters provided transcripts to the Court in half and full day volumes as follows: 7/14/14; 7/15/14 AM; 7/15/14 PM; 7/16/14 AM; 7/16/14 PM; 7/17/14; 7/21/14.

[4] As described below, WSI never entered into a contract with IIU.  Instead, IIU subcontracted with FEI, and FEI subcontracted with WSI.

9.      IIU's President is Frank Ukoh.  IIU has been in the construction business since 2001, but it is not a window contractor and most of IIU's past contracts were for lead and asbestos abatement at schools.  Tr. 7/17/14 at 4 (Ukoh).

10.     WSI is a window installation contractor; it has installed hundreds of thousands of windows in every condition from new construction to retrofitting occupied buildings.  Pl. Ex. 27 (Carlson Letter to Ukoh 6/5/11).

11.     Robert Carlson, President of WSI, has been in the construction business for 40 years, and has concentrated on the installation of doors and windows for 20 years.  Tr. 7/14/14 at 37 (Carlson).

12.     WSI's initial bid was for the installation of all vinyl "pocket windows," also known as "pocket fit" or "double hung" windows.  A pocket/double hung window is one that has two sashes that slide up and down in a frame.  Tr. 7/14/14 at 38, 39 (Carlson).

13.     After WSI's initial bid, the Government Contracting Officer's Technical Representative (COTR) Kevin Fleming, changed the Project requirements from vinyl pocket windows to vinyl-clad wood sash pack windows.  Tr. 7/14/14 at 38-40 (Carlson); Tr. 7/16/14 PM at 65, 71 (Fleming).

14.     A sash pack window kit usually includes: (1) upper and lower sashes, *i.e.*, the glass that slides up and down; (2) two jambliners, *i.e.*, the track system that mounts to the sides of the existing window frame; (3) a head stop; and (4) a sill dam.  Tr. 7/14/14 at 38 (Carlson); Def. Ex. 52 (Donnelly Letter 9/2011) at 4.[5]  A sash pack window is a window without a frame.  Tr. 7/14/14 at 38 (Carlson).

---

[5] It is unclear whether Mr. Donnelly intended to date this letter by month and year, *i.e.*, September 2011 (9/2011), or by month, day, and year, *i.e.*, September 20, 2011 (9/20/11).

15.     The installation of a sash pack window allows sash replacement while keeping the window framing and exterior casing in place.  *See* New Window Replacement, http://homerenovations.about.com/od/windowtips/qt/sash.replacement kit.htm (last visited Apr. 28, 2015).

16.     Mr. Fleming testified he had observed the successful installation of sash pack windows at Ft. Myer, Tr. 7/16/14 at 63 (Fleming), and he wanted to install sash pack windows because it would better preserve the historic look of the Officer Quarters, Tr. 7/16/14 PM at 71 (Fleming).

17.     Sash pack windows are more expensive and difficult to install than vinyl pocket windows.  Tr. 7/14/14 at 40 (Carlson).

18.     Mr. Carlson personally has installed many thousands of windows; hundreds, or even thousands, of the windows were sash packs.  Tr. 7/14/14 at 45, 47, 78 (Carlson).

19.     However, WSI had never before performed any contract for the installation of sash pack windows at an historic site.  Tr. 7/14/14 at 165 (Carlson).

20.     On December 21, 2010, WSI increased its price on the contract due to the change in Project requirements, and sent a revised schedule of values to IIU in the amount of $1,091,462, which included the purchase of sash pack windows instead of double-hung windows, *see* Pl. Ex. 11 (Schedule of Values).

21.     Mr. Carlson knew that the Quarters where "rather old" and that "an existing perfect [window] opening [was] just not reality."  Pl. Ex. 27 (Carlson Letter 6/5/11).

22.     There is no evidence that WSI objected to the substitution of sash pack windows or informed the Army, IIU, or FEI that sash pack windows would be problematic or unsuitable for the Project.

23.     Before work on the Project could begin, the windows had to be measured and ordered. WSI took field measurements over several days starting November 1, 2010.  Tr. 7/14/14 at 37 (Carlson).

24.     On November 1, 2010, Mr. Carlson himself visited the Project and instructed his crew on how to measure the windows.  Tr. 7/14/14 at 37, 177 (Carlson).

25.     Mr. Carlson told WSI Assistant Project Manager Aurelis Garcia to review and confirm the measurements, warning that "[i]f we go to sash pack units, the measurements need to be perfect as there is very little room for error . . . I'm uncomfortable that there are so many different sizes (well over 200 different sizes) . . . ."  Def. Ex. 8 (Carlson Email 12/3/10 and Field Measurements).

26.     The windows were not a uniform size.  All of the windows had to be "custom made," and Mr. Carlson fronted money for supplies.  Pl. Ex. 21 (Carlson Email 4/20/11).

27.     WSI sent the data to a window manufacturer, ABC Manufacturing, Inc. d/b/a Malta Windows & Doors (Malta), for the manufacture of sash pack replacement windows.  Tr. 7/14/14 at 44 (Carlson); Pl. Ex. 50 (Malta Invoice).

28.     WSI "intentionally order[ed] the windows to the smallest (level) square opening."  Def. Ex. 34 (Carlson Email 6/2/11); *see also* Pl. Ex. 27 (Carlson Letter 6/5/11).

29.     Malta's President, Wade Benjamin, testified that the Quarters were so old that no two frames were the same and all of the sash packs had to be ordered undersized.  Tr. 7/15/14 PM at 43 (Benjamin).

30.     Mr. Carlson believed that he would be able to install windows that would look and function as intended despite the condition of the old window openings.  Pl. Ex. 27 (Carlson Letter 6/5/11).

31.     On December 14, 2010, IIU subcontracted a portion of its work on the Project to FEI.  Pl.

Ex. 9 (IIU/FEI Contract).  The IIU/FEI Contract required FEI to supply labor, materials, and

equipment for the installation of 684 windows and 66 doors on the Project for the price of

$1,225,542.  *Id*. at 1.

32.     On January 12, 2011, FEI entered into a subcontract with WSI whereby WSI agreed to

install 684 sash pack windows and 66 doors at Fort McNair for the price of $1,091,462.  Pl. Ex.

17 (WSI/FEI Subcontract).  The WSI/FEI Subcontract provides that "Subcontractor [WSI] shall

perform all work and furnish and pay for all supervision, labor, materials, . . . tools, equipment,

supplies, and anything necessary for the construction and completion of all work described in

Exhibit A" and "Forney Enterprises, Inc. (FEI) shall pay Subcontractor for the performance of

the Work . . . ."  *Id*.

33.     Exhibit A to the WSI/FEI Subcontract defines the Work as replacement of windows and

doors on Quarters 1, 3 through 13, and 15 at Ft. McNair, and expressly excludes from the Scope

of Work: demolition, cleaning, insulation, patching, painting, repair of existing materials that

remain, interior caulking, interior trim, weather stripping on doors, and thresholds for doors.  Pl.

Ex. 17 (WSI/FEI Subcontract), Ex. A.

34.     The WSI/FEI Subcontract includes the following General Provisions pertinent to this

case:

### Article 2.1 Subcontractor's Investigations and Representations

Subcontractor [WSI] represents that it is fully qualified to perform this
Subcontract, and acknowledges that prior to the execution of this Subcontract it
has (a) by its own investigation ascertained and fully evaluated (i) the Work
required by this Subcontract, (ii) the conditions and difficulties involved in
performing the Work, (iii) the obligations of this Subcontract . . . and (iv) the
nature, locality and site of the Work; and (b)  verified all information furnished by
FEI or others, satisfying itself as to the correctness and accuracy of that
information.   Any failure by Subcontractor to investigate independently and

7

become full[y] informed will not relieve Subcontractor from its responsibilities hereunder.

## Article 2.3 Warranty

2.3.1 Subcontractor warrants to FEI [and] the Owner . . . that all Work will be of the quality required by the drawings and specifications, free from faults and defects . . . .  Subcontractor warrants that it . . . will perform [its] work and will . . . furnish material and equipment in a good and workmanlike matter.

## Article 2.4 Subcontractor Liability

2.4.1 Subcontractor hereby assumes the entire responsibility and liability for all Work, supervision, labor and materials provided hereunder . . . until final acceptance of the Work by the Owner, and shall at all times prosecute the Work in a good and workmanlike manner, with diligence and continuity . . . .

## 2.13 Inspection and Acceptance

2.13.1 Subcontractor shall provide appropriate facilities at all reasonable times for inspection, by FEI or the Owner, of the Work and materials . . . . Subcontractor shall promptly replace or correct any Work or materials which FEI or the Owner shall reject as failing to conform with the requirements of this Subcontract.

## 5.1 Schedule of Values

5.1.1 Before the first application for payment, Subcontractor must submit to FEI for its approval an itemized schedule of values . . .

5.2.1 This schedule . . . will be used only as a basis of Subcontractor's applications for payment.

## 5.2 Application for Payment

5.2.4  No partial payment shall be due Subcontractor unless and until FEI receives payment from Owner and provided that the Work has been approved by FEI and the Owner and provided that the Subcontractor is in compliance with the terms of its Subcontract.

## 5.3 Payments Withheld

FEI is not obligated to make any payment to Subcontractor under the Subcontract if . . . (a) Subcontractor has failed to perform its obligations under the Subcontract or otherwise is in default . . . .

**Article 9.1 Subcontractor's Failure to Perform; Termination for Default**

9.1.1  If, in the opinion of FEI, Subcontractor shall at any time (a) refuse or fail to provide sufficient properly skilled workers, adequate supervision or materials of the proper quality, (b) fail in any material respect to prosecute the Work according to FEI's current schedule, (c) cause, by any action or omission, the stoppage or delay of or interference with the Work of FEI or of any other contractor or subcontractor, (d) fail to comply with any provision of this Subcontract or the Contract Documents, . . . then, after serving three (3) days' written notice, unless the condition specified in such notice shall have been eliminated within such three (3) days, FEI, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties and without prejudice to any other rights of FEI under the law, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to FEI for the cost thereof, (ii) terminate for default Subcontractor's performance of all or a part of the Subcontract Work, or (iii) obtain specific performance or interlocutory mandatory injunctive relief requiring performance of Subcontractor's obligations hereunder (it being agreed by Subcontractor that such relief may be necessary to avoid irreparable harm to FEI and/or the Owner).

9.1.2 In the event of termination for default, FEI may, at its option, (a) enter on the premises and take possession, for the purpose of completing the Work, of all materials and jobsite equipment of Subcontractor, (b) take assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the Work by whatever method FEI may deem expedient.  In case of termination for default, Subcontractor shall not be entitled to receive any further payment until the Work shall be fully completed and accepted by the Owner and payment in full made by the Owner.  At such time, if the unpaid balance of the price to be paid shall exceed the expense incurred by FEI, including overhead and profit, such excess shall be paid by FEI to Subcontractor.  If such amount shall exceed such unpaid balance, the Subcontractor shall pay FEI the difference on demand.

**Article 13.3 Interface and Coordination**

13.3.1 Subcontractor, as well as its sub-subcontractors and trades, shall cooperate and fully coordinate their Work with one another and all other subcontractors for the purpose of securing a complete Project as required by the project schedule.

13.3.2 Subcontractor shall review the critical dimensions and elevations of its Work, and verify the previous Work as to its relationship to the Subcontractor's Work.  The Subcontractor shall promptly submit a written statement to FEI noting any discrepancies or unacceptable conditions prior to commencing with the Work of this Subcontract.  Do not attach to or cover over any material which is not properly installed.

35.     FEI's role on the Project was to process payments.  FEI did not supply labor or materials. It did not provide an on-site supervisor or otherwise oversee the Project.  This was clear from the beginning.  FEI President Keith Forney stated in an email to IIU President Frank Ukoh, "Please understand that we are not really managing the comings and goings of this deal, if you need something from Bob [Carlson] I suggest you call him and tell and vice versa . . . All we need [is] to be [copied] on all transmissions, thanks."  Def. Ex. 10 (Forney Email 12/20/10).

36.     Similarly, Mr. Forney emailed Messrs. Carlson and  Ukoh:

> So we are crystal clear, the only thing FEI is doing on this deal after creating the subcontracts is processing payments so for all practical purposes you should consider FEI as an invisible member of this team and as such we are not responsible for the resolution of any issue, either you or Frank is responsible for this entire contract.

Pl. Ex. 14 (Forney Email 12/23/10).

37.     Mr. Ukoh understood that FEI's role was to process payments, and he told Mr. Carlson that all invoices should be sent to FEI.  Pl. Ex. 16 (Ukoh Email 1/10/11).

**B. Work on the Project and Deficiencies**

38.     IIU was responsible for the preparation of the window openings.  It was required to do the "demolition," *i.e.*, removal of the old windows, as well as trim, caulking and painting.  Tr. 7/17/14 at 125 (Ukoh); Pl. Ex. 23 (Purvis Email 4/25/11); Pl. Ex. 25 (Ukoh Email 5/20/11).

39.     Greg Purvis was the Project Manager for IIU when the work started in April 2011; by June 21, 2011, he had been replaced.  Tr. 7/14/14 PM at 102 (Witthoff).

40.     WSI was responsible for the installation of new sash pack windows after the old windows were removed.  Pl. Ex. 17 (WSI/FEI Subcontract).

41.     WSI's Field Operations Manager Greg Jones managed WSI's work on the Project, and WSI's Site Superintendent Mark Witthoff was on the Project every day.  Tr. 7/14/14 at 14 (Carlson).

42.     Prior to starting work on the Project, on February 1, 2011 WSI prepared a mock up window installation at Ft. McNair.  There were some concerns with the first mockup, *see* Def. Ex. 16 (Purvis Email 2/2/11), but WSI addressed the issues and, on March 9, 2011, Mr. Fleming approved the second mock up.  Pl. Ex. 19 (Cheairs Email 3/8/11); Pl. Ex. 20 (Purvis Email 3/9/11)

43.     On April 25, 2011, work began on the Project; IIU began removing the old windows from Quarters 4.  Pl. 23 (Purvis Email 4/25/11).  The next day, WSI began to install the window sash packs.  *Id*.

44.     Officers and some of their families continued to live in the Quarters while the windows were replaced.  As a result, Mr. Fleming required that some of the old windows be demolished from the outside causing the removal of exterior stops which had to be reinstalled prior to the installation of the new windows.[6]  Pl. Ex. 25 (Carlson Email 5/20/15).

45.      IIU was slow to trim the newly installed windows.  On May 5, 2011, after WSI had installed about 100 windows, IIU had not yet trimmed any of them.  Pl. Ex. 24 (Carlson Email 5/5/11).

46.     After WSI had installed 100 sash kit windows in Quarters 1 and 4, the Army informed its prime contractor, IIU, that there were deficiencies in the work.  Mr. Ukoh relayed the message to Mr. Carlson:

> I just spoke to Kevin Fleming.  He is not happy at all and he made it known.  First he said that the quality of window material is inferior.  He said that the windows are not able to open and close freely.  That there are gaps everywhere (Greg's Problem with Trimming).  That he had ordered the work stopped and the two quarters finished.  The windows have to be able to open and close freely.  He said

---

[6] An "exterior stop" is an "external piece of wood trim attached to each side jamb that defines the outer edge for the upper sash channel."  *See* Renewal by Andersen Company, Glossary, http://www.renewalbyandersen.com/homeowner-help/glossary.aspx (last visited on May 14, 2015).

that he had similar windows installed at Ft. Myer and there were no problems.  He said that he want[s] to have a walk-through the two quarters when they are finished before he can approve payment for invoice submitted or else we have to start from the beginning.  The walk-through includes smooth operation of the windows.  (He mentioned that many times.)  He is not happy.  Please do your part and find out why the windows are not opening and closing freely.[7]

Def. Ex. 26 (Ukoh Email 5/10/11).

47.     Technical representatives of Malta, the window manufacturer, visited the Project on May

17, 2011.  They inspected some of the windows that WSI had installed and reported to Army's

Contracting Officer Kenneth Mitchell via email that the windows were the wrong size and were

poorly installed:

[T]he poor installation was the first thing we noticed followed by the sash being undersized.  Mark [Witthoff of WSI] had us follow him to what he considered to be the worst one.  After reviewing it, our conclusion was that the installation wasn't as up to par as it could have been.  Not just our opinion only but Mark agreed and I quote, "I could have spent a little more time shimming the sash in to get it more square [sic]."  After we got "the worst" window to shut and lock there was still a noticeable gap between the balance and the trim.  Not all windows had the exact same problems though.  Some windows would be considerably square where as some would have a 2" space from the sill to bottom of the glazing stop on one side and have a 2 ¾" space on the other side.  The fact that the holes for our balances to go into were unsquare was a huge issue in this situation.

Pl. Ex. 26 (Ten-Day Cure Notice) at 2 (Mr. Mitchell incorporated the email from Malta

employees in a Ten-Day Cure Notice to IIU).

48.     On May 19, 2011, a meeting was held between IIU, FEI, WSI, and the Army to discuss

the problems with the window installation.  Messrs. Ukoh and Carlson attended the meeting by

phone.  Tr. 7/17/14 at 25 (Ukoh).

---

[7] Mr. Carlson believed that the Malta windows were a "great product, superior to the junk I saw at Ft. Myer."  Def. Ex. 27 (Carlson Email 5/13/11).

49.     At the meeting, the Army indicated that there were problems with the window installation, that the measurements were off, and that the WSI's Payment Applications would not be paid until the problems on the Project were corrected.  Pl. Ex. 25 (Ukoh Email 5/20/11).

50.     In response, Mr. Carlson stated that, in his view, the size of the windows was not the major issue; the biggest problems were within IIU's scope of work—demolition, interior trim, and exterior stops.  Pl. Ex. 25 (Carlson Email 5/20/11).

51.     On May 24, 2011, Mr. Purvis, IIU Project Manager, emailed Mr. Ukoh and described various problems with the windows:

> The windows appear to be mismeasured, causing them to be short on the length by ½" or so, the same holds true with the storm windows.
> . . .
>
> The side (jam[b]liners) are short causing additional problems with operation.
> . . .
>
> After speaking with Wade [Benjamin] (the owner) of Malta Windows, his thoughts are that the windows were incorrectly measured causing a number of the problems listed above.

Def. Ex. 32 (Purvis Email 5/24/11).

52.     On May 25, 2011, the Army sent a Ten-Day Cure Notice to prime contractor IIU.  After recounting the criticism relayed by Malta technicians, the Ten-Day Cure Notice also stated:

> Work performed thus far by contractor has been substandard and poorly executed. Means and methods used for all aspects of work show lack of professional experience and unqualified technicians onsite performing the work. Demolition has been performed recklessly and restoration of openings cannot be done properly because the substrate has been butchered to the point that [it] inhibits the proper application of follow-on material, i.e., trim, stop, storm windows, etc.
>
> Additionally, new window units were installed but left unfinished for days allowing drafts and insects to enter despite attempts at sealing surrounds with insulation.  Windows and storm windows were not measured and verified for proper sizing prior to demolition creating situations where ill-fitting windows and storm windows were installed regardless. . . . Poor joinery of trim has resulted in open joints filled with caulk to compensate for the poor cuts.  Finish caulking was not tooled properly nor wiped down to achieve a finished appearance.  Contractor

did not have proper tools for start of job which shows insufficient or no recon of the requirements prior to work starting.  The project manager onsite, Greg Purvis [of IIU], had to make runs to purchase basic tools required for the job.

. . .

Window manufacturer claims that many windows were not measured correctly and will not function correctly in their current state.

Pl. Ex. 26 (Ten-Day Cure Notice) at 2.

53.    Mr. Mitchell also noted in the Ten-Day Cure Notice:

Contractor has made negative comments onsite to me . . . about the quality of windows and that this product is not the correct application for the job.  If this is so, why wasn't an alternative product that meets historical requirements and is a better fit offered prior to ordering 600 units that may not work?

Pl. Ex. 26 (Ten-Day Cure Notice) at 2.  Mr. Mitchell's reference to "Contractor" was undefined.

54.    In sum, the Ten-Day Cure Notice pointed out four problems with the windows, which the Court attributes to IIU or WSI in accord with the Scope of Work defined in the WSI/FEI Subcontract:  (1) IIU "recklessly" demolished the window openings, butchering the substrate and thus inhibiting the installation of the jambliners; (2) WSI's improper measurement and verification of the window openings resulted in ill-fitting windows; (3) when WSI installed the window units, IIU left them untrimmed so that drafts and insects could enter the housing units; and (4) IIU poorly joined the trim work and did not tool the caulking for a finished appearance.

55.    Army representatives, Messrs. Fleming and Mitchell, did not know which tasks were within IIU's scope of work versus WSI's scope of work.  Tr. 7/16/14 PM at 108 (Fleming).

56.    Mr. Ukoh described some of the problems with the Project to Mr. Carlson in an email on May 31, 2011.  In responding to the email, Mr. Carlson stated that WSI intentionally ordered the windows to the smallest (level) square opening to allow for discrepancies, because "[i]f the window is too large, there is nothing that can be done to cut it down, but if it is short, the opening

can be built down to make everything fit properly." Def. Ex. 34 (Carlson Email 6/2/11); *see also*

Pl. Ex. 27 (Carlson Letter 6/5/11).

57.     Mr. Carlson received a copy of the Ten-Day Cure Notice on June 3, 2011.  Def. Ex. 35

(Carlson Email 6/3/11).

58.     Mr. Carlson responded to the Ten-Day Cure Notice with a letter to Mr. Ukoh, which

stated that "the majority of issues relate[d] to the imperfect openings and preparation of them"

and that "the windows are measured correctly, will fit as provided, and are the right product for

the job."  Pl. Ex. 27 (Carlson Cure Notice Response 6/5/11).

59.     Mr. Carlson blamed the deficiencies on IIU, alleging that IIU mistakenly removed the

head stops, leaving a large gap at the top and making the new sashes appear to be too short.  Tr.

7/14/14 at 98, 134, 137 (Carlson); Tr. 7/15/14 AM at 67, 92 (Carlson).

60.     Mr. Witthoff claimed that IIU damaged the wooden window casings when removing the

old windows and that IIU failed to remove nails or excess paint from the window openings. Tr.

7/15/14 PM at 98-99 (Witthoff).

61.     Malta technician Shane McGrew described the problem caused by IIU's removal of the

head stops:

> It appears that measurements were taken based on existing conditions and after removal of old windows, more materials were removed making the openings larger.  During inspection it was discovered that the original head stops were altered or removed.  This therefore caused the jambliners to be too short and allows the windows to travel too far up and when closing, the interlock comes together pulling the top sash down to its true position.  The true position leaves a gap above the top sash.

Def. Ex. 46 (McGrew Letter 6/29/11).

62.      In order to fill that gap and to properly install the windows, the old head stop (or a new

one) had to be installed.  Tr. 7/15/14 AM at 92 (Carlson).

63.     The replacement of the head stops was an "easy fix."  Tr. 7/16/14 PM at 3-4, 48 (Donnelly).

64.     Mr. Witthoff double checked the window measurements daily as he worked.  He consistently found that the measurements matched the WSI spread sheet.  Tr. 7/16/14 AM at 12 (Witthoff).

65.     In mid-June, Malta technicians came to the Project to check the window measurements. Mr. Witthoff took them to Quarters 15 where no Work had occurred.  The Malta techs measured six or seven windows and compared their measurements to WSI's spreadsheets.  They determined that the measurements were the same, except for one window that had to be adjusted by 1/16 inch.  Tr. 7/16/14 AM at 8-11 (Witthoff).

66.     After establishing the process for taking field measurements on November 1, 2010, Mr. Carlson visited the project only one other time before the work started; he never visited the Project after the work started on April 25, 2011.  Tr. 7/14/14 at 178, 180 (Carlson); Tr. 7/16/14 PM at 75 (Fleming).  Mr. Carlson was seriously ill and distracted.  *See, e.g.*, Def. Ex. 27 (Carlson Email 5/13/11) (I have to leave for a doctor appointment for follow-up surgery . . ."); Def. Ex. 28 (Carlson Email 5/18/11) ("I have an appointment at the hospital tomorrow and can't be at the meeting.");  Def. Ex. 34 (Carlson Email 6/2/11) ("I have some complications and have to go back to the doctor (post surgery) shortly.");  Pl. Ex. 31 (Carlson Email 6/22/11) ("I have medical issues to deal with this afternoon.").

**C. Failure to Cure and Termination**

67.     After the Ten-Day Cure Notice was issued on May 25, work stopped on the Project to permit the parties to develop a corrective action plan.  WSI and IIU drafted such a plan, calling for removal of the installed sash pack windows by WSI, window opening preparation by IIU,

and reinstallation of windows by WSI.  Pl. Ex. 28 (Ukoh Letter to Mitchell 6/7/11)

(incorporating almost verbatim Pl. Ex. 27 (Carlson Letter to Ukoh 6/5/11)).

68.     In order to correct each window, WSI had to remove the sash kit windows; IIU

contractors then had to prepare each opening properly; and WSI had to reinstall the sash kit.  Tr.

7/16/14 AM at 14 (Witthoff).

69.     The corrective action plan was originally scheduled to begin on June 20, 2011, but

construction was halted that day due to an official function at Ft. McNair.  Tr. 7/16/14 AM at 17

(Witthoff).

70.     At the start of the cure period, IIU hired Greg Teasley to replace Project Manager Purvis.

Tr. 7/15/14 PM at 103-105 (Witthoff).

71.     On June 21, 2011, WSI had two workers on site.  Def. Ex. 58 (WSI Payrolls).

72.     Mr. Witthoff said that he and his coworker were one-half hour late.  Mr. Fleming was

upset at their tardiness and would not let them work.  Tr. 7/16/14 AM at 17-18 (Witthoff).

73.     On June 21, 2011, IIU gave FEI a written Three-Day Cure Notice that stated:

> [The contract] is subject to termination due to your inability to correct the
> deficiencies on [Q]uarters 4 and 1 conveyed to you on June 3, 2011.  The
> installation done at those quarters are below standard and do not meet [sic] the
> specification outlined in the Owner's scope of work.  The window manufacturer
> had [sic] concurred with this observation.  Even a layman can see that some of the
> installed windows are crooked. . . .  You provided answers to correct the
> deficiencies but today when you were authorized to resume work, you seem to not
> understand what you [were] supposed to do.  You only had two people on site
> who [did not] seem to understand that there is any deficiency to correct.  You are
> hereby requested to correct all deficiencies by Monday, June 26 or have your
> contract with us terminated for default.

Pl. Ex. 30 (Three-Day Cure Notice to FEI).

74.     The next day, June 22, Mr. Ukoh and Mr. Carlson exchanged emails.  Mr. Ukoh asserted

that WSI's two workmen showed up at the Project without knowing what they were supposed to

do, and that more than two workmen were necessary to cure the deficiencies because a

substantial number of the windows needed to be reinstalled.  Mr. Carlson, in turn, complained

that IIU was required to remove storm windows and replace unacceptable exterior stops *before*

WSI could even begin to reinstall the windows and that IIU's newly hired superintendent did not

know who was supposed to do what.  Pl. Ex. 31 (Emails between Ukoh and Carlson 6/22/11).

75.      Construction was halted on June 22 due to another official function.  Tr. 7/16/14 AM at

18 (Witthoff).

76.      On June 23, WSI removed four windows at the site so that the openings could be

prepared and the window sash packs reinstalled.  IIU's new Project Manager Greg Teasley and a

temporary carpenter were on site to prepare the windows by cleaning out paint build up,

removing nails, removing exterior stops, and reinstalling the stops on the demolished opening.

IIU did not complete any of the window openings.  WSI reinstalled the 4 windows anyhow,

because the Quarters were occupied and the window opening needed to be closed.  Tr. 7/16/14

AM at 19 (Witthoff).

77.      At the end of the day on Friday June 24, 2011, FEI gave written notice to WSI that it was

required to cure within three business days (by June 29) or it would be terminated for default.  Pl.

Ex. 32 (Three-Day Cure Notice to WSI).  The noticed specified:

> The reasons for this termination are that WSI has (1) failed to provide sufficient
> properly skilled workers and adequate supervision to properly complete the
> quality of work . . . and (2) failed to prosecute the work in accordance with the
> FEI schedule . . . .

*Id*. at 1.

78.      On Monday June 27, 2011, WSI had 2 workmen at the site.  Def. Ex. 58 (WSI Certified

Payrolls).

79.      On June 27, the work was substantially similar to the work on June 23: Mr. Witthoff and

his coworker removed a few windows, IIU's carpenter did some work on the openings but did

not complete a single window, and WSI reinstalled the windows.  Tr. 7/16/14 AM at 22 (Witthoff).

80.     At 9:40 a.m. on June 27, 2011, Mr. Ukoh of IIU sent an email to Mr. Forney of FEI, copying Mr. Carlson of WSI.  Mr. Ukoh stated that the windows were reinstalled and trimmed correctly but they were still not operating correctly.  Pl. Ex. 33 (Ukoh Email 6/27/11).

81.     Mr. Carlson did not respond to the June 24 letter or the June 27 email until June 29.  At 8:30 a.m. that morning, Mr. Carlson emailed Mr. Forney, copying Mr. Ukoh.  He denied that WSI had failed to provide sufficient manpower and that WSI had failed to comply with the FEI schedule for correcting deficiencies.  Mr. Carlson stated that "[m]ore manpower would have had no benefit as we were limited to the areas in which we could work;" that "no schedule was given to us;" and that "there is far more work to be done by others than is within our scope so we will not hold up the project."  Pl. Ex. 34 (Carlson Email 6/29/11 at 8:30).  He also stated that the problems with the windows were caused by the installation of insulation, wrongly required by Mr. Fleming, and by "improper demolition and opening preparation" which "prevented proper installation because the units can't be shimmed properly."  *Id*.

82.     WSI Site Superintendent Witthoff testified that he had advised against installing insulation, but did it anyhow when Mr. Fleming insisted and threatened to have Mr. Witthoff fired if he refused.  Tr. 7/15/14 PM at 99-100 (Witthoff); Tr. 7/16/14 AM at 28 (Witthoff); *see also* Pl. Ex. 39 (Carlson Letter 7/5/11).

83.     Mr. Fleming denied that he mandated the insulation, testifying that he merely had required the gaps around the windows to be sealed, and WSI chose to fill the gaps with insulation.  Tr. 7/16/14 PM at 107 (Fleming).

84.    Later the morning of June 29, Mr. Carlson sent a separate email to Mr. Ukoh and Mr.

Forney explaining why the "corrections" were not working:

> 1. The insulation that we were forced to install behind the jambliners is not
> allowing a straight channel for the windows to operate in and is also contrary to
> the manufacturers recommendations.  We are now going back to each opening
> and removing the insulation, which will allow the proper alignment.
>
> 2.  These first two buildings did not have the openings demolished and prepared
> properly.  . . . This should not be our responsibility to rectify this condition, but I
> have instructed my people to assist your people as a team and get things right . . .

Pl. Ex. 33 (Carlson Email 6/29/11 at 10:07); *see also* Pl. Ex. 35 (Carlson Email 6/29/11 at

10:42).

85.    Mr.Witthoff's last day of work on the Project was June 28, 2011; Mr. Fleming told him

not to come to work on June 29.  Tr. 7/16/14 AM at 24-25 (Witthoff).

86.    On June 29, 2011, IIU sent a formal notice of termination for default to FEI.  Pl. Ex. 36

(FEI Termination Letter 6/29/11).

87.    Mr. Forney notified Mr. Carlson of FEI's termination, impliedly terminating WSI.  Pl.

Ex. 37 (Forney Email 7/2/11).

88.    By letter dated September 8, 2011, FEI formally terminated WSI for default.  Pl. Ex. 44

(Forney Email 9/20/11, attaching 9/8/11 Letter).  The letter cited WSI's installation of windows

that "were not measured and verified for proper sizing, creating situations where ill-fitting and

improperly functioning windows were installed."  *Id.*

89.    At the time of termination, WSI had installed approximately 100 of 684 windows and 12

of 66 doors on the Project.  Tr. 7/15/15 at 47, 59 (Carlson); Def. Ex. 52 (Donnelly Letter 9/2011)

at 1, 3.

90.    After WSI's work on the Project was stopped, IIU or the Army contacted Malta for

assistance in completing the Project.  Malta Vice President of Sales Jonathan Young called

Robert Donnelly, head of Robert J. Donnelly Construction.  Tr. 7/16/14 AM at 80 (Donnelly).

Mr. Young and Mr. Donnelly had worked successfully on projects together for more than ten

years, when Mr. Young had worked for another window manufacturer.  *Id.*

91.      Mr. Donnelly has worked in the construction business for fifty years, doing remodeling

as well as new construction.  Tr. 7/16/14 AM at 76-77 (Donnelly).  The majority of Mr.

Donnelly's business for the past twenty years has been the replacement of windows, doors, and

decks.  *Id.* at 78.  He estimated that he has replaced 100,000 to 200,000 doors and windows;

some of the window projects involved the installation of sash pack windows.  *Id.* at 77-78.

92.      Mr. Donnelly offered the opinion that sash pack window kits are "an inexpensive way to

replace existing sashes, though on an old large home can be extremely time consuming."  Def.

Ex. 52 (Donnelly Letter 9/2011) at 3.

93.      Sash pack windows are more difficult to install than pocket windows.  Tr. 7/14/14 at 40

(Carlson).

94.      A sash pack window is "a very difficult product to work with, especially on large

windows."  Tr. 7/16/15 PM at 16 (Donnelly).

95.      Sash packs can function "reasonably well when used on moderately sized windows with

existing frames that are in good shape, fairly plumb and level."  Def. Ex. 52 (Donnelly Letter

9/2011) at 3.

96.      The windows in the Quarters at Ft. McNair are large—some as wide as 50 inches and

some as tall as 86 inches.  Def. Ex. 52 (Donnelly Letter 9/2011) at 3; Pl. Ex. 8 (Field

Measurements); Pl. Ex. 50 (Malta Invoice).

97.      Ft. McNair was established in 1791; ninety percent of the present buildings on the post's

100 acres were built, reconstructed, or remodeled by 1908.  *See* Ft. McNair History, available at

http://www.jbmhh.army.mil/web/jbmhh/AboutJBMHH/FortMcNairHistory.html (last visited

Apr. 28, 2015).

98.     The existing windows were approximately "105 years old, worn, twisted, out of square,

out of plumb and level."  Def. Ex. 52 (Donnelly Letter 9/2011) at 3.

99.     Mr. Witthoff encountered problems installing the sash pack windows from the beginning

of the Project because the window openings were out-of-plumb and out-of-square.  Tr. 7/16/14

AM at 51.  Mr. Witthoff testified that "the whole building was sagging."  *Id.* at 53.

100.    Sash pack windows are designed to fit within a "very close tolerance."  Tr. 7/16/14 PM at

6 (Donnelly).

101.    Mr. Witthoff agreed that the installation of sash pack windows requires more preparation

work on rough window openings.  Tr. 7/16/14 AM at 26 (Witthoff).

102.    Mr. Donnelly inspected the sash pack windows installed by WSI.  Out of 55 units

installed in Quarters 1, he determined that only two windows functioned properly and only three

were sized properly.  The windows were too short, too wide, and/or too narrow.  Def. Ex. 52

(Donnelly Letter 9/2011) at 3.

103.    At trial, Mr. Donnelly explained what he meant by stating that only two windows

"functioned properly."  "Function properly means that they go up and down, they lock properly,

and that there was no visible light coming through the sides or anything."  Tr. 7/16/14 PM at 2

(Donnelly).  And when he stated that only three windows were "sized properly," he meant that

they did not fit the opening properly in a way that "looked good."  *Id.*

104.    Some of the windows could hardly be moved up and down, while others would almost

fall down.  Tr. 7/16/14 PM at 2 (Donnelly).  Some of the gaps around the sashes were so large

that the sash would almost fall out.  Tr. 7/16/14 AM at 91 (Donnelly).

105.    Mr. Donnelly described problems with the jambliners:

> Sash kits have a track that has to be shimmed into position, and with these old jambs as crooked as they were the tracks then developed large gaps that could both be seen [and allowed] wind [to] blow thru—so to try and hide this it appears fiberglass insulation was stuffed behind the tracks.  The fiberglass however was visible and protruded out of the sash liners into the environment of the home, with its fibers free to be released into the air; this packing, which we found on most windows, also hindered normal window operation.

Def. Ex. 52 (Donnelly Letter 9/2011) at 3; Tr. 7/116/14 PM at 7 (Donnelly) (the liners are not rigid and they "contour to whatever is there").

106.    Mr. Donnelly found substantially similar problems with Quarters 4.  Def. Ex. 52 (Donnelly Letter 9/2011) at 4.

107.    The sash pack windows were "extremely unsightly;" they were a "product that didn't function." Def. Ex. 52 (Donnelly Letter 9/2011) at 4.

108.    When asked if the demolition had caused the windows not to function, Mr. Donnelly asserted that the lack of function had to do with the window sizing and the "quality of the install."  Tr. 7/16/14 PM at 3 (Donnelly).

109.    When asked whether he would have accepted the job if he had been offered a contract to install sash pack windows at Ft. McNair in the first place, Mr. Donnelly unequivocally stated that no, he would not have accepted the job.  Tr. 7/16/14 PM at 30-31 (Donnelly).  "No sense in taking a job that I don't think can be done."  *Id*. at 40.

110.    In Mr. Donnelly's opinion, "[A]nybody who had any experience with sash packs would know that you can't use them on this project, not successfully."  Tr. 7/16/14 PM at 42 (Donnelly).

111.    When Mr. Young offered Mr. Donnelly the job of reinstalling the Malta sash pack windows at Ft. McNair, Mr. Donnelly declined.  "I did not want the job. . . . those kits would

take forever, probably [would] become a nightmare to try and complete and have work properly."  Def. Ex. 52 (Donnelly Letter 9/2011) at 4.

112.    Mr. Young asked Mr. Donnelly if pocket windows would solve the problems, and Mr. Donnelly immediately agreed that they would.  "Pocket fit windows would dramatically reduce the install time and solve a lot if not all of the existing problems.  Pocket fit windows have their own frame, which is designed to fit within an existing window's frame creating a much more stable and workable product in a dramatically shorter work time."  Def. Ex. 52 (Donnelly Letter 9/2011) at 4.

113.    Malta President Benjamin wrote to Mr. Ukoh describing the problem with the window installation and agreeing that pocket windows would have been better for the Ft. McNair Project:

> We [i.e. Malta] originally thought that mismeasurement was the primary cause of problems, but later discovered that in order to provide a plumb, level, and square opening for the new windows, that the dimensions taken were correct.  This was further confirmed by having our tech reps measure approximately six windows in building 15.  Their measurements almost exactly matched the data provided by WSI for window ordering.  We concur that with a properly prepared opening, the windows on site will fit and operate as intended.  . . .
> Although it would have been better if a pocket window had been specified for this project, if the demolition is done correctly and the openings are properly prepared, the windows will function as intended.

Pl. Ex. 38 (Benjamin Letter 7/6/11).

114.    The Ten-Day Cure Notice did not reference any problems with the doors. Tr. 7/16/14 PM at 94 (Fleming); *see also* Tr. 7/16/14 AM at 23 (Witthoff) (Mr. Witthoff was unaware of problems with the doors during the cure period).

115.    Mr. Fleming accepted the doors that were installed.  Tr. 7/16/14 PM at 94-95 (Fleming); *see also* Tr. 7/16/14 AM at 23 (Witthoff).

116.    The standard spacing around a door in an old building is a maximum of 1/8 (or 2/16) inch.  Def. Ex. 52 (Donnelly Letter 9/2011) at 1; Tr. 7/16/14 AM at 84 (Donnelly).

117.    In Mr. Witthoff's view, a slightly larger spacing of 3/16 inch is acceptable around a door. Tr. 7/16/14 AM at 31 (Witthoff).

118.    When Mr. Donnelly inspected the doors installed by WSI, he determined that the doors were too narrow, leaving gaps almost 1/2 inch wide on the sides where wind and light entered. Def. Ex. 52 (Donnelly Letter 9/2011) at 1.

119.    Mr. Donnelly also found that most of the doors were cut too short, that the gap at the bottom was large enough to allow drafts, insects, and animals to intrude.  Def. Ex. 52 (Donnelly Letter 9/2011) at 2.

120.    A few of the doors could not open all the way because they scraped over old, warped floors.  These doors needed to be adjusted to permit the door to open completely, even though the adjoining floor was not level, and had to be fitted with a sweep to cover any gap that would exist when the doors were closed.  Def. Ex. 52 (Donnelly Letter 9/2011) at 2; Tr. 7/16/14 AM at 87-88 (Donnelly).

121.    The strike plates were installed on the door jambs at the wrong depths and were crooked. Def. Ex. 52 (Donnelly Letter 9/2011) at 1; Tr. 7/16/14 AM at 87 (Donnelly).

122.    Many of the hinges were replaced with hinges of a different size.  Def. Ex. 52 (Donnelly Letter 9/2011) at 2; Tr. 7/16/14 AM at 88 (Donnelly).

123.    One door was installed with broken screws in the top hinge—the screw heads had been sheared off and were just glued in place.  Missing three working screws in the top hinge made the door unsafe, as the door could have fallen.  Def. Ex. 52 (Donnelly Letter 9/2011) at 2; Tr. 7/16/14 AM at 85-86 (Donnelly).

124.    IIU ordered double hung/pocket windows from Malta and retained Donnelly Construction to perform the necessary demolition work and install all new windows and doors.

During August and September 2011, Donnelly Construction removed and replaced all 684 windows and 66 doors on the Project.

**D. Billing and Payments**

125.    IIU paid WSI's Payment Application No. 1 in the amount of $26,000 for field measuring. Pl. Ex. 45 (Payment Applications Nos. 1 – 4); Pl. Ex. 15 (Flowers Email 1/10/15) (first payment was for measuring).

126.    IIU did not pay WSI's Payment Applications Nos. 2, 3, or 4, *see* Pl. Ex. 45, which included the  following charges:

| Description | Schedule Value | Completed/Stored |
| --- | --- | --- |
| Shop drawings/submittals | $13,000 | $13,000 |
| Install material/equip (684 x 100.093)[8] | 68,464 | 68,464 |
| Door Hardware (66 x 230.00) | 15,180 | 15,180 |
| Storm windows (684 x 110.00) | 75,240 | 75,240 |
| Storm window labor (684 x 50.00) | 34,200 | 5,262 |
| Wood doors (66 x 974.00) | 64,264 | 64,264 |
| Door labor (66 x 325.00) | 21,450 | 3,300 |
| Window (684 x 591.00) | 677,436 | 677,436[9] |

---

[8] The Payment Applications read "[i]nstall material/equip (684 x 10) [=] 68,464" revealing a typographical error.  For an install cost of $68,464, the charge was actually $100.093 for each of the 684 windows.  The $100.09 figure was provided on the Schedule of Values that WSI prepared in the fall of 2010 before the WSI/FEI Subcontract was signed.  Def. Ex. 4 (Schedule of Values).

[9] At trial, FEI claimed that the cost of the Malta sash pack windows was unfairly inflated, *i.e.*, that the cost of windows was not actually $677,436 but instead was only $280,000.  Mr. Carlson testified that the price for the windows was $677,436, but he was entitled to a substantial discount due to his ownership interest in Malta.  Tr. 7/14/14 at 182-183 (Carlson).  The Court does not resolve this debate, as its resolution is not necessary to this Opinion or accompanying Order of Final Judgment.

| | | |
|---|---|---|
| Window labor (684 x 350.00) | 96,208 | 14,801 |
| **TOTAL** | **$1,065,462** | **$936,967** |

127.     FEI and IIU did not submit Payment Applications 2, 3, or 4 to the Army because they objected to billing for close to the full contract price when the work was less than 10% complete. Mr. Carlson responded that the bill was for materials.  Messrs. Forney and Ukoh demanded the submission of supplier invoices for all materials on site.  *See* Pl. Ex. 22 (Emails between Forney and Carlson 4/25/11); Pl. Ex. 24 (Emails between Carlson and Ukoh May 4 & 5, 2011); Pl. Ex. 25 (Emails between Carlson and Ukoh May 19 & 20, 2011).

128.     Payment Applications 2-4 remained unsubmitted and unpaid because problems with the window installation on the Project came to light.

129.     The Army required Quarters 1 and 4 to be "complete, inspected and cleared" before it would permit the work to proceed to other Quarters and the Army would not "entertain payment questions" unless and until Quarters 1 and 4 were complete and accepted.  Def. Ex. 31 (Ukoh Email 5/20/11).

130.     On August 8, 2011, WSI notified Hanover of its Payment Bond Claim in the amount of $936,967.00.  Pl. Ex. 43 (Notice of Payment bond Claim).

131.     IIU sought payment from the Army to pay WSI's suppliers, altogether $371,364.11.  Pl. Ex. 41 (Schedule of Supplier Invoices); Pl. Ex. 42 (IIU Invoice).  WSI's suppliers were Falcon Door & Window, Inc. (Falcon); House of Antique Hardware (Antique Hardware); Midwest Wholesale Hardware (Midwest); and Diamond Doors Ltd. (Diamond).  Pl. Ex. 46 (Falcon Invoices); Pl. Ex. 47 (Antique Hardware Invoices); Pl. Ex. 48 (Midwest Invoices); Pl. Ex. 49 (Diamond Invoices).

132.     The Army paid IIU $371,364.11 on August 4, 2011.  Pl. Ex. 61 (IIU Payments Received).

133.     IIU certified to the Army that it would pay all of the WSI suppliers, *see* Pl. Ex. 42 (IIU

Invoice), but instead IIU paid only the Malta invoice for $280,000 and the Diamond invoice for

$30,083.  In exchange for payment, Malta and Diamond released IIU, WSI, FEI and the Army

from liability on the invoices.  Def. Ex. 54 (Malta Release 9/27/11); Def. Ex. 55 (Diamond

Release 9/28/11).

134.     IIU kept the remainder of monies ($61,342.36) to finish the Project.  Tr. 7/17/14 at 181

(Ukoh).

**E.  This Lawsuit**

135.     WSI disputes that its work was in any way deficient and seeks damages for breach of

contract and quantum meruit recovery for unjust enrichment.  WSI claims that the window

deficiencies were the fault of IIU and the Army as follows:  (1) IIU butchered the window

openings during demolition and failed to remove thick old paint and nails which prevented the

jamb liners from being installed correctly; (2) IIU belatedly installed trim and caulking, which

allowed insects to intrude through gaps; (3) IIU generally did a poor job with the trim work,

creating unsightly gaps which were sloppily filled with caulk; and (4) the Army insisted on sash

pack windows instead of double hung windows and insisted on the installation of insulation

behind the vinyl jambliners, causing the jambliners to bulge and prevent the sashes from sliding

freely.

136.     FEI claims that WSI materially breached the contract, that WSI's work and materials had

no value, and that WSI should pay FEI lost profits in the amount of $75,000.  FEI alleges that the

windows did not fit and did not function because WSI measured the window openings

incorrectly.

137.    WSI filed a three-count Complaint: Count I, alleging breach of contract against FEI;

Count II, alleging unjust enrichment against FEI; and Count III, alleging action on a payment

bond against Hanover Insurance Company. *See* Compl. [Dkt. 1]. FEI filed an Amended

Counterclaim for breach of contract;[10] Hanover did not join in the Amended Counterclaim. *See*

Am. Countercl. [Dkt. 23].

138.    The Complaint asserted damages in the amount of $936,967.00, but later WSI reduced its

claim by $310,083.00, the combined amount that IIU paid directly to WSI's suppliers Malta and

Diamond. Notice of Reduction of Claim [Dkt. 17]. Accordingly, WSI seeks recovery of

$626,884, plus prejudgment interest and attorney fees.

139.    A bench trial was held from July 14 through 21, 2014, and the parties submitted proposed

findings of fact and conclusions of law. *See* WSI Post Trial Briefs [Dkts. 60, 62]; FEI Post Trial

Briefs [Dkts. 59, 61].

**F. Credibility Findings**

140.    Mr. Carlson testified honestly, as his demeanor and candor demonstrated. Nonetheless,

the Court notes that Mr. Carlson has a large interest in the outcome of this case, which

undoubtedly affected his perceptions. He tried to explain WSI's own errors by blaming others—

Messrs. Fleming, Ukoh, and Forney. Mr. Carlson asserted that the problems with the window

installation were due to IIU's mistaken removal of the head stop at the top of the windows. Tr.

7/14/14 at 98, 134, 137 (Carlson); Tr. 7/15/14 AM at 67, 92 (Carlson). There was no evidence,

however, that the removal of the head stop caused the windows to fail to move freely, and Mr.

Carlson failed to explain the gaps along the *sides* of the windows.

---

[10] The counterclaim for indemnification was dismissed. *See* Op. [Dkt. 45] at 6-9; Order [Dkt.
46].

141.     The evidence showed that Mr. Carlson was not attentive to this Project, probably due to illness.  After training his crew how to measure the window and door openings on November 1, 2010, he did not visit the site while the work was in progress in April and May 2011 or during the cure period in June 2011.  During the cure period, when time was of the essence, Mr. Carlson did not respond to the June 24 Three-Day Cure Notice or the June 27 email from Mr. Ukoh (stating that the reinstalled windows still did not operate correctly) until June 29, the very last day of the cure period.  Pl. Ex. 34 (Carlson Email 6/29/11 at 8:30).  Therefore, the Project proceeded without his expertise.

142.     Mr. Donnelly was a forthright and honest witness, with no interest in the outcome of this case.  His demeanor was straightforward, with small exceptions, as he defended Robert J. Donnelly Construction as the company that eventually completed the Project.

143.     Mr. Forney's testimony was largely unhelpful.  FEI was only involved in the Project for the purpose of obtaining the bond and processing payments.  From the beginning, Mr. Forney instructed WSI and IIU to deal with each other directly.  Def. Ex. 10 (Forney Email 12/20/10); Pl. Ex. 14 (Forney Email 12/23/10).  Mr. Forney did not have personal knowledge regarding the actual work on the Project.

144.     The Court does not credit the testimony of IIU President Ukoh.  Mr. Ukoh admitted that he submitted invoices from WSI suppliers to the Army for payment and that he certified to the Army that he would pay these suppliers, but he only paid Malta and Diamond, keeping the remaining $61,342.36 for other purposes.  Tr. 7/17/14 at 181 (Ukoh).  Further, Mr. Ukoh was defensive and evasive in answering questions.

145.     WSI Site Superintendent Witthoff provided credible testimony, and he had more detailed knowledge of the Project than any other witness because he was there on a daily basis.  Any bias

30

in favor of WSI, his employer, did not undercut the key points of his testimony.  Mr. Witthoff

testified that he had advised against installing insulation, but did it anyhow when Mr. Fleming

insisted and threatened to have Mr. Witthoff fired if he refused.  Tr. 7/15/14 PM at 99-100

(Witthoff); Tr. 7/16/14 AM at 28 (Witthoff); *see also* Pl. Ex. 39 (Carlson Letter 7/5/11).  Mr.

Donnelly confirmed Mr. Witthoff's opinion that it was a mistake to put insulation behind the

jambliners because it hindered the operation of the windows.  Def. Ex. 52 (Donnelly Letter

9/2011) at 3; Tr. 7/116/14 PM at 7 (Donnelly).

146.     Mr. Fleming was an evasive witness, and based on his demeanor at trial, the Court does

not find him to be credible.  Although WSI is ultimately responsible for agreeing to install sash

pack windows, as discussed below, Mr. Fleming is the person who insisted on this particular

product.  Without any expertise regarding window installation, Mr. Fleming mandated that sash

packs be installed.  The Court further disbelieves Mr. Fleming's testimony that he did not tell

Mr. Witthoff to install insulation behind the jambliners or risk losing his job.  Mr. Witthoff was

more credible on this point.  Mr. Fleming's denial—that he merely required the gaps around the

windows to be sealed and WSI chose to fill the gaps with insulation—did not ring true and was

inconsistent with the record evidence of Mr. Fleming's high-handed actions.  Tr. 7/16/14 PM at

107 (Fleming).

## II. LEGAL STANDARDS AND CONCLUSIONS OF LAW

### A. Motions to Admit Expert Opinions

WSI proffered the testimony of its president, Mr. Carlson, as both a fact and an

expert witness, and FEI similarly proffered the testimony of the head of Robert J. Donnelly

Construction, Mr. Donnelly.  Under Federal Rule of Evidence 701, a lay witness may testify only

as to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly

understanding the witness's testimony or to determining a fact in issue; and (c) not based on

scientific, technical, or other specialized knowledge within the scope of Rule 702." In order to

present opinions that are outside the scope of Rule 701, a witness needs to be qualified as an

expert. Expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The court serves as a gatekeeper for expert testimony; that is, Rule 702 imposes a "special

obligation upon a trial judge" to ensure that expert testimony is (1) relevant because it will assist

the trier of fact and (2) reliable because it is based on sufficient facts, data, or scientific

knowledge. *Kuhmo Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v.

Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)); *see also Meister v. Med. Eng'g Corp.*, 267

F.3d 1123, 1126 (D.C. Cir. 2001).

### 1. Mr. Carlson

Mr. Carlson was qualified as an expert in window and door installation due to his

knowledge and experience gained over 20 years of working in the window and door replacement

business. Tr. 7/14/14 at 37 (Carlson). He offered the opinion that IIU did a poor job in

demolishing the old windows, *i.e.*, preparing the window openings for the installation of new

windows. He testified that the head stops should have been left in place but IIU removed them,

leaving a large gap at the top and making the new sashes appear to be too short. Tr. 7/14/14 at

98, 134, 137 (Carlson); Tr. 7/15/14 AM at 67, 92 (Carlson).  Mr. Carlson further opined that the

sash pack windows were the right product for the job and could have been installed successfully

if IIU had prepared the window openings properly. Tr. 7/14/14 at 134, 137 (Carlson); *see also* Pl.

Ex. 27 (Carlson Cure Notice Response 6/5/11) ("The majority of issues relate to the imperfect

openings and preparation of them" and "the windows are measured correctly, will fit as

provided, and are the right product for the job.").

Despite the fact that Mr. Carlson had expert knowledge, the Court finds that his

opinion was not reliable.  It was not based on any particular facts, data, scientific principles or

methods.  Further, he has an obvious interest in the outcome of this suit.  Also, the record shows

that he may not have been aware of problems on the Project at the time they were occurring

because he did not visit the Project while the Work was in progress.  He may have been kept

away due to illness.  The Court affords his opinion little weight.

## 2. Mr. Donnelly

Mr. Donnelly was qualified, by knowledge and experience, to testify regarding

window and door installation.  He has worked in the construction business for fifty years, doing

remodeling as well as new construction.  Tr. 7/16/14 AM at 76-77 (Donnelly).  The majority of

Mr. Donnelly's business for the past twenty years has been the replacement of windows, doors,

and decks.  *Id*. at 78.  He estimated that he has replaced 100,000 to 200,000 doors and windows.

*Id*. at 77.  Some of the projects he has worked on involved the installation of sash pack windows.

*Id*. at 78.

Mr. Donnelly offered the opinion that sash pack windows can be used only to

replace moderately-sized windows with existing frames that are fairly plumb and level.  Def. Ex.

52 (Donnelly Letter 9/2011) at 3.  The window openings at Ft. McNair were quite large—some

as wide as 50 inches and as tall as 86 inches—and they were "105 years old, worn, twisted, out

of square, out of plumb and level." *Id*.  Because the windows at Ft. McNair were large, out-of-

square, and out-of-plumb, Mr. Donnelly indicated that sash pack windows could not be used

successfully.  *Id*.; Tr. 7/16/14 PM at 42 (Donnelly).   When Mr. Donnelly inspected the sash pack

windows that WSI had installed in Quarters 1, he found that only two functioned properly, that

others did not slide up and down or lock properly, and light penetrated along the sides.  Def. Ex.

52 (Donnelly Letter 9/2011) at 3; Tr. 7/16/14 PM at 2 (Donnelly).  He found similar conditions

in Quarters 4.  Def. Ex. 52 (Donnelly Letter 9/2011) at 4.  Mr. Donnelly described the gaps along

the window jambs, stating "[w]ith these old jambs as crooked as they were the tracks then

developed large gaps that could both be seen [and allowed] wind [to] blow thr[ough]."  Def. Ex.

52 (Donnelly Letter 9/2011) at 4.  Mr. Donnelly testified that he would not even enter into a

contract to install sash pack windows in a building like the Quarters at Ft. McNair because there

is "[n]o sense in taking a job that I don't think can be done."  Tr. 7/16/14 PM at 40 (Donnelly);

*see also* Def. Ex. 52 (Donnelly Letter 9/2011) at 4.  He testified that "anybody who had any

experience with sash packs would know that you can't use them on this project, not

successfully."  Tr. 7/16/14 PM at 42 (Donnelly).

        As a third party with no interest in the outcome of this case, the Court finds that

Mr. Donnelly was not biased.  Further, his explanation of the problem with sash pack installation

in old and crooked window openings was grounded in undisputed fact and logic.  WSI does not

dispute that old buildings settle, causing the window openings to become out-of-square, or that

the Quarters at Ft. McNair are over 100 years old.

        The evidence supports a finding that the majority of the window openings in the

Quarters were, in fact, out-of-square and out-of-plumb.  Mr. Witthoff encountered problems

installing the sash pack windows from the very beginning of the Project because the windows

were out-of-plumb and out-of-square.  Tr. 7/16/14 AM at 51 (Witthoff).  "[T]he whole building

was sagging."  *Id*. at 53 (Witthoff).  Upon inspecting the sash pack windows that WSI had

installed, the Army found gaps around them.  Pl. Ex. 26 (Ten-Day Cure Notice) at 2 ("[There

was a] noticeable gap between the balance and the trim.  Some windows would be considerably

square where as [sic] some would have a 2 [inch] space from the sill to bottom of the glazing

stop on one side and have a 2 ¾ [inch] space on the other side."); Tr. 7/16/14 PM at 107

(Fleming) (gaps around windows had to be sealed).

### B. Liability for Breach of Contract

A litigant bears the burden of proving each element of his claim by a

preponderance of the evidence.  *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Service*, 885 F.

Supp. 2d 156, 181 (D.D.C. 2012).  The preponderance standard requires a factfinder to decide

that the existence of a fact is more probable than not.  *Concrete Pipe & Products of Calif., Inc. v.

Constr. Laborers Pension Trust for S. Calif.*, 508 U.S. 602, 622 (1993).  "[A] factfinder must

evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to

demonstrate the truth of the asserted proposition with the requisite degree of certainty."  *Id*.

To prevail on a claim of breach of contract, a party must establish (1) a valid

contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of

that duty; and (4) damages caused by breach.  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187

(D.C. 2009).  A "breach" is "an unjustified failure to perform all or any part of what is promised

in a contract entitling the injured party to damages."  *Fowler v. A & A Co.*, 262 A.2d 344, 347

(D.C. 1970) (citation and quotation marks omitted).  A "material" breach is one where the

injured party received something substantially less or different from that for which he bargained. *Id*.

FEI argues that WSI breached the contract by failing to measure the window openings properly, causing WSI to order and install sash packs that did not fit or function. However, at trial there was no evidence to support the claim that WSI mismeasured.  Mr. Carlson testified how his crew carefully measured the windows and that he had to order the windows sized to the smallest level window opening due to the fact that the old window openings were not square.  While the Army's Ten-Day Cure Notice stated that windows were mismeasured, this characterization was based on the observations of the Malta technicians and there was no evidence that anyone actually measured any of the window openings and compared them to the sash packs.  *See* Pl. Ex. 26 (Ten-Day Cure Notice); Tr. 7/17/14 at 44 (Ukoh). Similarly, Mr. Donnelly indicated that the windows were too short, too narrow and too wide, *see* Def. Ex. 52 (Donnelly Letter 9/2011) at 3, but his testimony was unsupported by any actual re-measurement.  In fact, when the Malta technicians returned to the Project to check the measurements, they re-measured six or seven windows in Quarters 15 and found that WSI had correctly measured all but one, and that single window required an adjustment of only 1/16 inch. Tr. 7/16/14 AM at 8-11 (Witthoff).  The evidence showed that the sash packs did not fit well due to the out-of-square, out-of-plumb condition of the old window openings themselves, not because WSI measured the window openings incorrectly.

While WSI did not breach due to mismeasurement, it is nevertheless liable for breach of contract because it breached the implied covenant of good faith. "Under District of Columbia law, every contract contains within it an implied covenant of both parties to act in good faith and damages may be recovered for its breach as part of a contract action." *Choharis*

*v. State Farm Fire & Cas. Co.*, 961 A.3d 1080, 1087 (D.C. 2008).  The implied covenant of good

faith means that "neither party shall do anything which will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract."  *Allworth v. Howard*

*Univ.*, 890 A.2d 194, 201 (D.C. 2006).  There is no single definition of good faith and fair

dealing, as the duty varies depending upon the context in which it arises.  *Id.*  Good faith requires

"faithfulness to an agreed common purpose and consistency with the justified expectations of the

other party."  Restatement (Second) Contracts § 205.  Bad faith includes circumstances where a

party "evades the spirit of the bargain, lack of diligence and slacking off, willfully rendering of

imperfect performance, abuse of power to specify terms and interference with or failure to

cooperate in the other party's performance."  *Id.*; *see also Paul v. Howard Univ.*, 754 A.2d 297,

320 (D.C. 2000).  Further, when a buyer informs a seller of the particular purpose for which

purchased goods are to be used and the buyer relies on the seller's skill and expertise, there is an

implied condition that the goods furnished should be reasonably fit for the purpose intended.

D.C. Code § 28:2-315.

       The "common purpose" and "spirit of the bargain" of the WSI/FEI Subcontract,

as well as the "justified expectation" of the parties, was that WSI would install functioning

windows and doors in the Quarters at Ft. McNair.  FEI subcontracted with WSI, an expert

installer, for the installation of windows and doors.  Both parties understood that the windows

needed to be fit for the specified purpose, *i.e.*, the replacement of very large windows in very old

historic buildings.  When the Army COTR, Mr. Fleming, solicited a bid for the installation of

sash pack windows, he relied on WSI to determine whether that type of window could be

installed successfully.  The Army, FEI, and their representatives were not window installation

experts.

The Court credits Mr. Donnelly's expert opinion that sash pack windows could not be used successfully at Ft. McNair because the window openings were old, large, out-of-square, and out-of-plumb.  Def. Ex. 52 (Donnelly Letter 9/2011) at 3; Tr. 7/16/14 PM at 42 (Donnelly).  As a window installation expert, Mr. Carlson should have known that sash pack windows would not fit or function properly in the Quarters at Ft. McNair.  On November 1, 2010, before WSI entered into the WSI/FEI Subcontract and before WSI ordered the windows and doors, Mr. Carlson visited Ft. McNair to instruct his crew on the measurement process.  Tr. 7/14/14 at 37.  At that time, he personally observed the size of the windows and the age of the Quarters.  In addition, Mr. Carlson reviewed the field measurements taken by the WSI crew, and noted that when ordering sash pack windows "there is very little room for error."  Def. Ex. 8 (Carlson Email 12/3/10 and Field Measurements).  He expressed concern that there were well over 200 different unique dimensions needed for the Project.  Def. Ex. 8 (Carlson Email 12/3/10 and Field Measurements).  Because the window openings were not plumb and square, WSI measured and ordered "the windows to fit the smallest, level, plumb, square opening."  Pl. Ex. 27 (Carlson Letter to Ukoh 6/5/11).  After visiting the site and reviewing the measurements, Mr. Carlson should have seen a red flag.  Nevertheless, WSI never informed the Army, IIU, or FEI that sash pack window kits were unsuitable for the Project.[11]  WSI had a duty of good faith to contract for the installation of windows that were fit for the purpose intended; by agreeing to install sash pack windows, WSI breached its duty of good faith.[12]

---

[11] Comments by an employee of WSI or IIU to Mr. Mitchell that the product was "not the correct application for the job," *see* Ten-Day Cure Notice at 2, were made too late to rescue the Project, as WSI had already purchased 684 sash pack windows and had installed, however imperfectly, over 100 of them.

[12] WSI does not argue that its failure to perform was excused because installation of the sash pack windows was commercially impracticable.  Under the doctrine of impracticability, a party may be excused from his contractual obligations where the contract was impracticable or its

WSI argues that its failure to perform the contract was excused because an essential condition precedent to window installation was IIU's proper preparation of the window openings. *See Merando v. Mathy*, 152 F.2d 21 (1945) (party may be excused from performance if the other party failed to perform essential condition precedent). WSI contends that IIU's poor workmanship prevented the installation of functional windows: (1) IIU butchered the window openings during demolition, leaving uneven surfaces that prevented the proper installation of the sash packs; (2) IIU improperly removed the head stop, leaving a large gap at the top of the window openings; (3) IIU failed to remove paint buildup and nails, again preventing the proper installation of the sash packs; (4) IIU placed a series of incompetent Project Managers at the site who allowed the reckless demolition and poor preparation of the window openings to continue; and (5) IIU was slow to trim the windows, and when IIU did install trim, it did so badly. *See, e.g.*, Ten-Day Cure Notice (window openings were butchered, trim joined poorly); Tr. 7/14/14 at 98, 134, 137 (Carlson) (IIU mistakenly removed the head stops, leaving a large gap at the top); Tr. 7/15/14 AM at 67, 92 (Carlson) (same);[13] Tr. 7/16/14 AM at 19 (Witthoff) (nails and paint buildup needed to be removed); Pl. Ex. 24 (Carlson Email 5/5/11) (about 100 windows were in place and no trim was installed).

WSI's assignment of blame is substantially undermined by the fact that WSI installed approximately 100 windows without notifying FEI that IIU's window opening preparation was in any way unacceptable, as required by the Subcontract. *See* WSI/FEI Subcontract, Art. 13.3.2 ("Subcontractor shall promptly submit a written statement to FEI noting

purpose was frustrated due to circumstances "of which he had no reason to know." Restatement (Second) of Contracts § 266 (1981). This defense is unavailable because WSI knew all of the critical facts at the time of contracting.

[13] The head stop could be quickly and easily replaced. Tr. 7/16/14 PM at 3-4, 48 (Donnelly).

any discrepancies or unacceptable conditions prior to commencing with the Work.").[14]  If WSI actually deemed the window openings to be deficient, it was unreasonable for WSI to continue to install unacceptable windows despite the site conditions.  By failing to provide written notice, WSI waived any right it might have had to assert IIU's faulty preparation of the window openings as a material default that excused WSI from performing its contractual obligations.  *See Sun Secured Financing, LLC v. ARCS Commercial Mortg. Co. LP*, 730 F. Supp. 2d 132, 139-40 (D.D.C. 2010) (failure to satisfy condition precedent results in waiver of the associated right). Moreover, WSI's attempt to cast blame elsewhere misses the critical fact that WSI's breach was antecedent to any failure by IIU—WSI breached its obligations at the onset, by agreeing to install sash pack windows without protest when they were unsuitable for the Project.

While many of the deficiencies cited in the Ten-Day Cure Notice were within the scope of IIU's work—particularly demolition, trim, and painting—the critical problem was that the windows did not move up and down freely, they did not lock properly, and air and light was able to penetrate through gaps along the sides.  Tr. 7/16/14 PM at 2 (Donnelly); *see also* Pl. Ex. 26 (Ten-Day Cure Notice) at 2 (windows "will not function correctly in their current state"); Def. Ex. 26 (Ukoh Email 5/10/11) (Mr. Fleming indicated that "the windows are not able to open and close freely."); Def. Ex. 32 (Purvis Email 5/24/11) (jambliners "are short causing additional problems with operation").  The actual cause of the window malfunction was the unevenness of the antique window openings coupled with the fact that sash pack windows cannot be installed well in large, out-of-square, out-of-plumb window openings like those at Ft. McNair.[15]  In sum,

---

[14] Mr. Carlson's testimony that he notified FEI and IIU regarding IIU's improper demolition referred only to emails he sent *after* WSI had installed more than 100 windows, too late to satisfy the contractual notice requirement.

[15] Stuffing the sides of the windows with insulation, as Mr. Fleming demanded, only made matters worse.  But again, WSI breached the Subcontract in the first place, by agreeing to the

WSI's breach—its initial agreement to install sash packs and its subsequent installation of non-functioning windows—compromised the contract's essential purpose, *i.e.* the installation of functioning windows.

WSI argues that FEI breached the WSI/FEI Subcontract by failing to pay WSI, including failing to seek payment from IIU and advising the Army not to make payments on the Project.[16]  WSI also complains that Mr. Forney was never on site, that FEI's sole role was to provide a bond, and that Mr. Forney ordered WSI to deal directly with IIU directly.  These allegations are not material, as there is no allegation that FEI failed to perform any essential condition precedent to WSI's contractual duties.  To reiterate: WSI materially breached the Subcontract in the first instance, thereby relieving FEI of its contractual obligations.  *See Rosenthal v. Sonnenschein Nath and Rosenthal, LLP*, 985 A.2d 443, 452 (D.C. 2010) (party to a contract has no further obligation to perform if the other party is in "material breach"); *see also* WSI/FEI Subcontract, Art. 5.3 ("FEI is not obligated to may any payment to Subcontractor under the Subcontract if . . . Subcontractor has failed to perform its obligations under the Subcontract or otherwise is in default.").

---

installation of sash pack windows, and WSI waived any right to complain about Mr. Fleming's insistence on insulation when it failed to provide written notice of the problem to FEI.

[16] WSI argues erroneously that FEI was obligated to pay its bills because FEI did not object to its Payment Applications within 3 days of receipt.  *See* Pl. Ex. 16 (Carlson Email 1/10/11) ("When I submitted the Schedule of Values in November and our billing, it was indicated that if we did not hear within 3 days of any objection, the billing was assumed to be accepted.")  Such an obligation was not part of the Subcontract, which contains an integration clause.  *See* WSI/FEI Subcontract, Art. 14.3 ("This Subcontract contains the entire Agreement between the parties hereto with respect to the matters covered herein.  No other agreements, representations, warranties, or other matters, oral or written, shall be deemed to bind the parties hereto.")

### C. Damages for Breach of Contract

In the ordinary case, when a party fails to complete a service to which it agreed, the non-breaching party is entitled to receive the amount it cost to complete the service, to the extent that amount exceeds the original contract price. *Rowan Heating–Air Conditioning–Sheet Metal v. Williams,* 580 A.2d 583, 585 (D.C. 1990). But here, FEI did not complete the Project. Instead, the prime contractor (IIU) cured the deficiencies by hiring a new subcontractor, and IIU paid the new subcontractor itself. IIU signed a settlement with FEI, agreeing not to seek any damages from FEI. Having no responsibility for the costs involved in the cure, FEI cannot recover such costs from WSI. For this reason, the Court limited FEI to recovery of lost profits. *See* Op. [Dkt. 45] at 8-9; Order [Dkt. 46].

FEI seeks lost profits in the amount of $75,000. While a litigant need not prove damages with mathematical certainty, he must prove some reasonable basis upon which damages may be estimated. *Mashack v. Superior Mgmt. Servs., Inc.*, 806 A.2d 1239, 1241-42 (D.C. 2002); *Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C. 1991). "[D]amages cannot be awarded on the basis of mere speculation or guesswork." *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). If a party establishes breach of contract but fails to demonstrate actual damages or its proof of damages is vague or speculative, the party is entitled to no more than nominal damages. *See Cahn v. Antioch Univ.*, 482 A.2d 120, 120 (D.C. 1984); *FCE Benefit Adm'rs, Inc. v. George Washington Univ.*, 209 F. Supp. 2d 232, 243 (D.D.C. 2002).

Mr. Forney testified at trial that FEI suffered $75,000 in lost profits that would have been paid if IIU had not terminated FEI's contract and if the WSI/FEI Subcontract had been completed successfully. Tr. 7/21/14 at 46 (Forney). FEI did not submit any evidence to support this figure. The evidence showed that IIU agreed to pay FEI $1,225,542, that FEI agreed to pay

WSI $1,091,426, and that the bond premium was $27,683.  Pl. Ex. 9 (IIU/FEI Contract); Pl. Ex.

17 (WSI/FEI Subcontract); Compl., Ex. A (Bond).  There was no evidence regarding FEI's

overhead, administrative costs, or other costs on the Project.  At trial, Mr. Forney was unsure

whether he had ever submitted a payment application to IIU that included FEI's profits.  *Id*. at

52.  Without any reasonable basis for calculating lost profits, FEI has not met its burden of proof.

Because FEI was limited to lost profits but failed to prove what they were, the Court will award

only nominal damages in the amount of $1.00 to FEI for WSI's breach of contract.

### D. Unjust Enrichment

In addition to the breach of contract claim against FEI, the Complaint includes an

unjust enrichment claim against FEI, also known as a claim for quantum meruit recovery.  *See*

Compl., Counts I & II.  A plaintiff states a claim for unjust enrichment by alleging that the

plaintiff conferred a benefit on defendant, the defendant retained the benefit, and under the

circumstances such retention was unjust.  *See Armenian Assembly of Am., Inc. v. Cafesjian*, 597

F. Supp. 2d 128, 134 (D.D.C. 2009).  The Court dismissed the unjust enrichment claim because

there was a written contract, the WSI/FEI Subcontract, covering the same subject matter.  *See*

Order [Dkt. 27].

On the first day of trial, WSI orally moved for reconsideration, insisting that the

unjust enrichment claim should be reinstated because Count III of the Complaint seeks payment

from Hanover as surety on a payment bond that is governed by the Miller Act,[17] 40 U.S.C.

---

[17] The Miller Act requires a prime contractor on a government construction project to post
performance and payment bonds, guaranteeing the performance of the contractor's contractual
duties and the payment of subcontractors and suppliers.  40 U.S.C. § 3131.  On a government
project, liens are precluded due to sovereign immunity, and thus the payment bond serves as
security for subcontractors and suppliers.  *See United States v. Munsey Trust Co.*, 332 U.S. 234,
241 (1947).  That is, subcontractors and materialmen who are not paid cannot place a lien on

§§ 3131-3134.  FEI objects, erroneously asserting that WSI never sued Hanover for unjust

enrichment.  In fact, Count III incorporates by reference Count I (breach of contract) and Count

II (unjust enrichment), and thus WSI has sued Hanover for unjust enrichment.  FEI was an

indemnitor on the bond and thus FEI and Hanover's defenses and interests in this litigation are

aligned.  Hanover and FEI are represented by the same counsel, who litigated on behalf of both

clients without distinguishing their interests in any way.

   In a Miller Act suit, an unjust enrichment claim can be joined with a breach of

contract claim; the presence of a written contract does not preclude the unjust enrichment claim.

*See U.S. ex rel. Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.*, 479 F.2d 638, 641 (4th Cir.

1973).  Further, under the Miller Act, a subcontractor can recover in quantum meruit without

regard to its ability to recover on the contract.  *Id.* ("The impact of quantum meruit is to allow a

contractor to recover the value of services rendered irrespective of whether he would have lost

money on the contract and been unable to recover in a suit on the contract.").[18]  Therefore, the

Court reinstates the claim for unjust enrichment.

---

government property but instead they can seek payment by pursuing recovery under the payment
bond.  *See* 40 U.S.C. § 3131(b).  Section 3131(b)(1) provides:

> Every person who has furnished labor or material in carrying out
> work provided for in a contract for which a payment bond is
> furnished under section 3131 [formerly section 270a] of this title
> and that has not been paid in full within 90 days after the day on
> which the person did or performed the last of the labor or furnished
> or supplied the material for which the claim is made may bring a
> civil action on the payment bond for the amount unpaid at the time
> the civil action is brought and may prosecute the action to final
> execution and judgment for the amount due.

[18] FEI raises a "pay-when-paid" defense, arguing that IIU never paid FEI and thus FEI does not have to
pay WSI.  *See* WSI/FEI Subcontract, Art. 5.2.4 ("No partial payment shall be due [WSI] unless and until
FEI received payment from [IIU] and provided that the Work has been approved by FEI and [IIU] and
provided that [WSI] is in compliance with the terms of its Subcontract.")  This defense arises from the
terms of the contract and is inapplicable to the claim for unjust enrichment.

On an unjust enrichment claim under the Miller Act, a subcontractor may obtain quantum meruit recovery in the amount of "the reasonable value of the services rendered," *i.e.*, "the amount for which such services could have been purchased from one in the plaintiff's positon at the time and place the services were rendered." *Algernon Blair*, 479 F.2d at 641; *accord U.S. for Use and Benefit of Mariana v. Piracci Constr.*, 405 F. Supp. 904, 907 (D.D.C. 1975). If some of the workmanship or material was defective, quantum meruit recovery must be reduced accordingly. *See U.S. ex rel. Metric Elec., Inc. v. Enviroserve, Inc.*, 301 F. Supp. 2d 56, 67 (D. Mass. 2003).

The sash pack windows that WSI installed did not function properly, as discussed in detail above. The windows had no value and thus no benefit was conferred on FEI. Accordingly, WSI's claim for unjust enrichment fails with regard to the windows. The installation of the doors requires more discussion. WSI installed 12 doors at the Project, and Mr. Fleming, the Army's COTR, accepted the work. Tr. 7/16/14 PM at 94-95 (Fleming); *see also* Tr. 7/16/14 AM at 23 (Witthoff). However, Mr. Fleming's acceptance is not evidence of "reasonable value." In fact, Mr. Donnelly's testimony that doors had no value was credible and persuasive. There were large gaps around the doors—up to 1/2 inch—when the space should be only 1/8 inch to 3/16 inch. Tr. 7/16/14 AM at 84 (Donnelly) (1/8 inch space is acceptable); Tr. 7/16/14 AM at 31 (Witthoff) (3/16 is acceptable). The strike plates were crooked and installed at incorrect depths, and many of the hinges were replaced with hinges of a different size. Def. Ex. 52 (Donnelly Letter 9/2011) at 2; Tr. 7/16/14 AM at 87-88 (Donnelly). Mr. Donnelly also found that most of the doors were cut too short and that the gaps at the bottom were large enough to allow drafts, insects, and animals to intrude. Def. Ex. 52 (Donnelly Letter 9/2011) at 2. Also, some of the doors could not open all the way because they scraped against the floor. These

doors needed to be adjusted to permit the door to open completely even where the floor was not level, and had to be fitted with sweeps to cover any gap that would exist when the doors were closed.  Def. Ex. 52 (Donnelly Letter 9/2011) at 2; Tr. 7/16/14 AM at 87-88 (Donnelly).  One of the doors was installed with a hinge attached by screws where the heads were sheared off and glued on, creating a hidden and dangerous defect that Mr. Fleming cannot be deemed to have accepted.  Def. Ex. 52 (Donnelly Letter 9/2011) at 2; Tr. 7/16/14 AM at 85-86 (Donnelly).  Because the door installation had no value, no benefit was conferred on FEI and WSI is not entitled to quantum meruit recovery.

### E.  Army Payments To IIU

Based on a motion in limine filed by FEI, the Court excluded as not relevant evidence regarding IIU's submissions to the Army and the Army's payments to IIU.  *See* Op. [Dkt. 52]; Order [Dkt. 53].  Understanding that the evidence pertained to IIU invoices to the Army for the cost to cure, *i.e.* to replace the windows and doors installed by WSI and to complete the remaining doors and windows, and finding that FEI could not sue WSI for the monies expended by IIU (and not FEI) to cure, the Court determined that the Army's payment on the IIU invoices was not relevant.  Op. [Dkt 52] at 13-14.  The issue of Army payments to IIU was presented in context at trial, and WSI moved for reconsideration.

The trial evidence showed that the Army paid IIU on invoices from WSI suppliers Malta, Diamond Doors, Falcon, Antique Hardware, and Midwest.  Despite IIU's certification that it would pay the suppliers, IIU paid only Malta and Diamond because IIU needed the money to finish the Project.  Tr. 7/17/14 at 181 (Ukoh).  The invoices from Falcon, Antique Hardware and Midwest total $61,342.36, and WSI asserts that FEI is liable to it for this amount.

Upon hearing the evidence, the Court realized that the Army payment to IIU did not concern IIU's material costs in curing the deficiencies on the Project (which were not relevant to the suit between WSI and FEI), but instead concerned WSI's material costs, as they were invoices from WSI suppliers.  Accordingly, the Court reconsidered the motion in limine and admitted the evidence.  Even so, this evidence is not relevant to this case.  There was no evidence that FEI received payment on WSI supplier invoices.  Further, IIU is not a party,[19] and IIU's receipt of monies on supplier invoices does not bear on the litigation between WSI and FEI.

## IV. CONCLUSION

WSI breached the WSI/FEI Subcontract and therefore FEI is excused from payment.  Despite the finding of a breach, FEI will be awarded only nominal damages because it failed to prove lost profits.  Judgment will be entered in favor of FEI, and FEI will be awarded nominal damages of $1.00.  A memorializing Order of Final Judgment accompanies this Opinion.

Date: May 14, 2015

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

---

[19] For reasons unrevealed by the record, WSI voluntarily dismissed IIU as a defendant early in this litigation.  *See* Notice of Dismissal [Dkt. 8].